**J. T. FULFORD, Appellant,**

v.

**Jesse V. B. FORMAN, Elmer G. Gardner and Murphey W. Luna, Appellees.**

**No. 16329.**

United States Court of Appeals
Fifth Circuit.

May 17, 1957.

Rehearing Denied June 14, 1957.

Austin C. Wilson, Houston, Tex., T. J. McMahon, Abilene, Tex. (Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., McMahon, Smart, Walter, Sprain & Wilson, Abilene, Tex., of counsel), for appellant.

Neil Brooks, Asst. Gen. Counsel, Dept. of Agriculture, Paul A. Sweeney, Chief, Appellate Section, Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C., for appellees.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is another skirmish in the smoldering controversy between West Texas cotton farmers who feel that allocation of acreage under the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq., unfairly fails to take into account the recent trend toward intense cultivation of cotton under irrigation and those of East Texas who contend that what they have perhaps gotten back for the 1956 crop was only a portion of that unfairly taken from them and given to those in West Texas in the 1954 and 1955 adjustments for trends. Save that

litigation on a wide front,[1] petition to political and executive bodies for legislative and administrative relief and other peaceful means of persuasion have been substituted as the weapons, it has much of the character[2] of earlier cattle-sheep disputes of the Western range.

Here the battle, while waged on a narrow front, may be decisive. For if the farmer, Fulford, is right that the Review Committee is not confined to considering and determining that which the County Committee could take into account, then whatever inequities, discriminations or wrongs are done at any of the successive stages of the administrative hierarchy can be corrected on the spot by the local[3] county folk comprising the Review Committee.

The question for us, as for the District Court and the Review Committee, is whether the function of the Review Committee is so limited.

The farmer's complaint is simply stated: for the crop year 1956 Texas received a State allotment of 7,410,893 acres. This was 2.65% less than 1955. Pursuant to the Act, 7 U.S.C.A. § 1344 (e), the State Committee established the maximum allowable 10% State Reserve of 741,089 acres. But whereas, 80.5% in 1954 and approximately 60% in 1955 of the State Reserve was allocated (much of it to the newly productive areas of the West Texas counties), as an adjustment for "trends in acreage", the State Committee for 1956 determined (see note 16, *infra*) to allow no part of

1. Besides the instant case by a farmer appealing from a denial of jurisdiction by a Review Committee, a suit by a farmer directly against members of the State Committee, recently determined adversely to the farmer and presumably now on appeal to this Court, was filed in Southern District of Texas, Hawkins v. State Agricultural Stabilization and Conservation Committee, D.C., 149 F.Supp. 681; and a similar action against the Secretary of Agriculture in the United States District Court for the District of Columbia, Floyd Garrett v. Benson, C.A. 664–56, is apparently still pending undetermined.

2. While adopting the contention of the attorney representing the Secretary of Agriculture that the Review Committee lacked jurisdiction to hear Fulford's appeal, the written statement of the members of the Review Committee shows that we are not dealing with an academic controversy:

"We the Review Committee: In our opinion, this case is out of our jurisdiction. In our opinion, not only has Mr. Fulford been discriminated against, but all the farmers of this West Texas area also have been sold short. And all we want is our fair share of the State allotments. If the State office can take our cotton allotments this year and give it to East Texas farmers, they can do the same next year. We just don't believe in this kind of Democracy."

3. On Reorganization Plan No. 2 of 1953, 5 U.S.C.A. § 133z–15 note, there was transferred "to the Secretary of Agriculture all functions not now vested in him

of all other officers, and of all agencies and employees, of the Department of Agriculture." The Plan became effective midnight June 3, 1953, and effective June 4, 1953, the Secretary of Agriculture 18 F.R. 3648 provided:

"* * * I hereby reconstitute the Department as it existed immediately prior to the effective date of Reorganization Plan No. 2, 1953. Under this order there are hereby reassigned to all agencies, officers, and employees, whose functions are transferred to me by Plan No. 2 those functions in accordance with the assignments as they existed immediately prior to the effective date of the Plan. The functions, reassigned shall be exercised, pursuant to such orders, instructions and delegations as existed immediately prior to the effective date of Reorganization Plan No. 2, which delegations, orders and instructions are hereby reissued, to remain effective until revoked or modified * * *."

No such revocation or modification respecting the Review Committee has ever been issued.

Both Section 4(c) of the Plan and the President's letter of transmittal, March 25, 1953, to the Congress stated that the purpose of vesting all responsibility in the Secretary was "to simplify and make effective the operation of the Department of Agriculture, to place the administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and local conditions."

the Reserve to be so used in 1956. Not only that, out of the 62.8% (465,465 acres) designated by them under another statutory category for "hardships and inequities," approximately 191,000 acres was, by a special formula, in effect assigned to areas (presumably East Texas) to partially offset the 1954, 1955 increases to other areas. The upshot was that in contrast to a statewide cut of but 2.65% and an actual increase in many counties to 103%, or more, the allocation of acreage to Terry County and Fulford's farm was 7% less than in 1955.

When the impact of this allocation to Terry County was translated into the acreage allotment (157.9 acres) to Fulford, he appealed, as permitted by the Act, to the county Review Committee,[4] claiming that he ought to have been allotted 171.2 acres. But by formal petition and orally before the Review Committee, he was careful to point out that no complaint was made as to action taken by the County Committee, and that his grievance was directed entirely at the action of the State Committee in its distribution[5] of the State Reserve. At the hearing in which a tender of evidence sufficient at least to show the existence of a genuine controversy was made, the Review Committee adopted the view pressed so hard by counsel for the Secretary that one of his own regulations[6] prevented this body from reviewing an assertedly wrongful act of another of his agents (the State Committee). On Fulford's appeal to the District Court,[7] the Judge, in a persuasive opinion, Fulford v. Forman, D.C.Tex., 144 F.Supp.

4. 7 U.S.C.A. § 1363, "Any farmer who is dissatisfied with his farm marketing quota may, within fifteen days after mailing to him of notice as provided in section 1362 of this title, have such quota reviewed by a local review committee composed of three farmers from the same or nearby counties appointed by the Secretary. Such committee shall not include any member of the local committee which determined the farm acreage allotment, the normal yield, or the farm marketing quota for such farm. Unless application for review is made within such period, the original determination of the farm marketing quota shall be final."

5. The Application for Review specified: "* * * This claimed inequity and discrimination does not result from the actions of the county committee nor are the cotton marketing quotas above set out unfair, inequitable, or discriminatory with reference to similar farms in Terry County, but the matters complained of and the unfairness, inequity, and discrimination claimed by the applicant are attributed to the establishment and allocation of the State Acreage Reserve."

6. 7 C.F.R. § 711.30(b), "* * * In all cases the review committee shall consider only such matters as, under the applicable provisions of the act and regulations of the Secretary of Agriculture thereunder, are required or permitted to be considered by the county committee in the establishment of the quota sought to be reviewed."

7. 7 U.S.C.A. § 1365: "If the farmer is dissatisfied with the determination of the review committee, he may, within fifteen days after a notice of such determination * * * file a bill in equity against the review committee * * * in the United States district court * * * sitting in the county or the district in which his farm is located, for the purpose of obtaining a review of such determination * * * Thereupon the review committee shall certify and file in the court a transcript of the record upon which the determination complained of was made, together with its findings of fact."

7 U.S.C.A. § 1366: "The review by the court shall be limited to questions of law, and the findings of fact by the review committee, if supported by evidence shall be conclusive * * *. At the earliest convenient time, the court * * * shall hear and determine the case upon the original record of the hearing before the review committee, and upon such record as supplemented if supplemented, by further hearing before the review committee pursuant to direction of the court. The court shall affirm the review committee's determination, or modified determination, if the court determines that the same is in accordance with law. If the court determines that such determination or modified determination is not in accordance with law, the court shall remand the proceeding to the review committee with direction either to make such determination as the court shall determine to be in accordance with law or to take such further proceedings as, in the court's opinion, the law requires * * *."

536, sustained a motion to dismiss[8] for want of jurisdiction.

If the regulation is valid, the matter would end there. But since rejection of the regulation sought by Fulford would still leave us with the question whether the Act itself gives such wide review powers to the Review Committee, we think it better to rest decision on the statute directly.

In this approach we conclude that the Act does not invest the Review Committee with any such wide powers.

At the outset, we must remember that involving, as it does, the national policy of dealing with the ever-present problem of farm surpluses, stability of farm income, and the use of Governmental sanctions or incentives in control of production and price, this is a matter of delicate complexity. It has been and still is a major problem challenging succeeding administrations of the legislature and the executive. In a legislative structure so abstruse that, as it sets forth formula which, to the tutored, reflects the product hammered out in the legislative process, but to the uninitiated, appears to be an unintelligible stream of words, it would be completely unrealistic for us to judge this serious matter by an undue reliance upon the simple, literal words of Section 1363, note 4, supra.

The simplicity of the words or the ease of resolution by accepting them and nothing else ought not to beguile us into forgetting the admonition, United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350, on the "literal interpretation dogma":

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning.

When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words * *."

In determining what Congress intended by language of Section 1363 which defines power of review neither negatively nor affirmatively, a fair test would be the consequences to the whole legislative program were this vast power of review recognized. That in legislative acts of plain purpose, there may be alarming or disturbing consequences gives no right to the judiciary to prevent what may have been a Congressional blunder. But where legislative intent is not plainly manifest, such consequences, especially as they pose threats of alarming proportions to the effective operation of a comprehensive program, are relevant guides in indicating at least what Congress did *not* intend.

If, as claimed, the language of Section 1363, note 4, supra, is so broad that a county Review Committee can review the action of the State Committee in allocating the State Reserve (or any of its other functions), so it can pass upon the actions of the Secretary himself, not only in allocating that State's acreage, but in the making of many other indispensable determinations. What would this do to the organic whole?

Of course, the heart of the Act is the elimination of excessive supplies of cotton, 7 U.S.C.A. § 1341, through a detailed scheme for regulating production. "The framework of the Act itself, both as originally passed and as amended, and the reports of the congressional committees that drafted it, show a prime purpose to limit national and individual farm production and marketing to the

8. As the original administrative record by stipulation and order was brought here presumably the trial court considered it and the pleadings.

quotas allotted * * *," Rodgers v. United States, 332 U.S. 371, 375, 68 S. Ct. 5, 8, 92 L.Ed. 3, 7. And control of " * * * total supply, upon which the whole statutory plan is based, depends upon control of individual supply," Wickard v. Filburn, 317 U.S. 111, 130, 63 S.Ct. 82, 91, 87 L.Ed. 122, 138. And Congress expressly found that "conditions affecting the production and marketing of cotton are such that, without Federal assistance, farmers, individually or in cooperation, cannot effectively prevent the recurrence of excessive supplies of cotton * * *," 7 U.S.C.A. § 1341.

At the top of this inverted pyramid, the total amount of cotton which may be produced has to be, and is, fixed by a single agency, the Secretary. This is the National Marketing Quota which can be promulgated only after determining whether the "total supply"[9] of cotton for the marketing year will exceed the "normal supply."[10]

Once fixed within statutory minimums, 7 U.S.C.A. § 1342, approved by the Farmer Referendum 7 U.S.C.A. § 1343, and proclaimed, the National Marketing Quota must be translated by the Secretary into a National acreage Allotment[11] which, after proper determination, he must then apportion[12] to the several cotton producing states as the State Allotment.

Responsibility, initial at least, for the apportionment of the State acreage allotment among the counties is in the State Committee[13] on the same basis[14] as applicable to the State, note 12, supra, except for a permissive 10% State Reserve.[15]

Specifically then five important judgment decisions are committed,[16] subject

9. 7 U.S.C.A. § 1301(b) (16) (C): The "total supply" of cotton is defined as the "carry-over at the beginning of such marketing year, plus the estimated production of cotton in the United States during the calendar year in which such marketing year begins and the estimated imports of cotton into the United States during such marketing year."

10. 7 U.S.C.A. § 1301(b) (10) (C): The "normal supply" of cotton is the "estimated domestic consumption of cotton for the marketing year for which such normal supply is being determined, plus the estimated exports of cotton for such marketing year, plus 30 per centum of the sum of such consumption and exports as an allowance for carry-over."

11. 7 U.S.C.A. § 1344(a): " * * * The national acreage allotment for cotton shall be that acreage, based upon the national average yield per acre of cotton for the five years immediately preceding the calendar year in which the national marketing quota is proclaimed, required to make available from such crop an amount of cotton equal to the national marketing quota."

12. 7 U.S.C.A. § 1344(b): "The national acreage allotment * * * shall be apportioned to the States on the basis of the acreage planted to cotton (including the acreage regarded as having been planted to cotton under the provisions of Public Law 12, Seventy-ninth Congress) during the five calendar years immediately preceding the calendar year in which the national marketing quota is proclaimed, with adjustments for abnormal weather conditions during such period."

For 1956 from the National acreage Allotment of 17,391,304 acres, the Secretary apportioned 7,410,893 acres to Texas, 20 F.R. 8250.

13. A State Committee is composed of from three to five farmers appointed by the Secretary, 7 U.S.C.A. § 1388, 16 U.S.C.A. § 590h(b).

14. 7 U.S.C.A. § 1344(e): "The State acreage allotment * * * shall be apportioned to counties on the same basis as to years and conditions as is applicable to the State under subsections (b) [note 12, supra] * * * of this section."

15. The State Committee may "reserve not to exceed 10 per centum of its * * * allotment * * * which shall be used to make adjustments in county allotments for trends in acreage, for counties adversely affected by abnormal conditions affecting plantings, or for small or new farms," 7 U.S.C.A. § 1344(e).

16. In the Secretary's regulations, 20 F.R. 8247 et seq., establishing the National acreage allotment and apportioning it amongst the States, detailed regulations, Section 722.716, prescribe how the State Committee is to compute County Acreage Allotments, determine and use the State Acreage Reserve for adjustments specified note 15, supra, to correct inequities, and to prevent hardship. By Amendment

to the Secretary's approval, to the State Committee: (1) whether a Reserve is needed; (2) if so, its amount, not to exceed 10 per cent; (3) its distribution within the statutory categories, note 15, supra; (4) whether "adjustments for abnormal weather conditions" is necessary; and (5) if so, in what areas, to what extent and *from* which areas will the required adjustment acreage come.

As the program gets close to the soil, the County Allotment [17] is to be apportioned by the County Committee [18] under detailed regulations.

At the end of this long process and after approval by the State Committee, Section 722.729(a), 20 F.R. 8257, the County Committee mails a notice to the farmer fixing his farm acreage allotment (and marketing quota) for that farm. And it is at this point, for the first time, that the Review Committee, composed of three farmers appointed by the Secretary from the same county, note 4, supra, comes into play.

■ Of course, in this complex scheme both County Committee and Review Committee have much importance. Considering that restriction in the use of one's own farmland presents a basic conflict with traditional notions of free enterprise, the purpose of Congress is readily seen in lodging responsibility for this last definitive act in the farmer's neighbors or fellow citizens. Important as is their task, especially as it bears upon the economic survival of their neighbors, the legislative pattern shows that the function of the County Committee is fairly to distribute that which has been allocated to that county. But since the standards to be followed are invariably general, and many are so flexible that they would open up avenues for discrimination whether intentional, inadvertent, corrupt, or accidental, there was need for another agency, the County Review Committee, having local roots and hence local responsibility for the review of such actions. The system assures not only initial determination, but a complete review anew of the whole matter by neighbors who must live with their decisions. The statutory requirement, note 4, supra, that members of the Review Committee must come from that or a nearby county and may not include a person who, as a county committee member, "determined the farm acreage allotment, the normal yield, or the farm marketing quota for such farm" indicate quite positively that Congress meant to establish an initial and a reviewing agency of *local* people having *local* responsibility for decisions concerning *local* factors having a definitive *local* impact.

■ This sketchy view of this intricate legislation just as positively reflects a certainty that Congress did not intend to lodge in these local groups the awesome responsibilities for the nation and state-wide functioning of this program. Conceding that three cotton farmers can better plant, cultivate, and pick a crop, can better determine and evaluate the numerous local adjustments permitted under the Act than could some Washington Administrative counterparts, is it likely that Congress would leave to persons of unknown experience,

2, 20 F.R. 8951–8952, the Texas County Acreage Allotments were promulgated by the Secretary. This included specifically the percentage and acreage breakdown of the State Reserve (741,089 acres) and specific allocation of it to each of the counties as adjustments for small farms (34.41%) new farms (2.68%), and to correct inequities and to prevent hardship (62.8% or 465,465 acres) with none (0%) for trends in acreage. It is these very allocations which Fulford attacks.

17. Section 722.716(e), 20 F.R. 8250: "*County acreage allotment.* The county acreage allotment shall be the sum of (1) the computed county acreage allotment determined under paragraph (b) of this section, and (2) the acreages from the State acreage reserve which are added to the computed county acreage allotment under subparagraphs (1) and (2) of paragraph (c) of this section * *." See notes 14 and 15, supra.

18. It is composed of three farmers elected by the farmers in the county, 7 U.S.C.A. § 1388, 16 U.S.C.A. § 590h(b).

training and qualifications, neither screened nor approved by it, the determination of the difficult questions and the making of the decisions either to put the Act into operation or determine its course? Disregarding the personal competence of the individuals, is it likely that Congress without making suitable provision for an adequate staff, appropriation of unavoidably large sums of money for necessary research, collection, gathering and assimilation of facts, would delegate to such a body the determination of the Total Supply of cotton, the Normal Supply, the excess of the Total over the Normal, the number of bales to be fixed in the National Marketing Quota, the National average yield per acre for the five preceding years, the number of acres on such yield required to produce the National Marketing Quota, the acreage planted in the several states during the five preceding years, the average acreage planted, the distribution of the National Allotment to the states, the nature, kind and extent of abnormal weather conditions suggesting adjustment, when, where and to what extent the adjustment is to be made?

Dealing with statutory minimums of ten million bales, any one of these decisions involves not only staggering sums of money in terms of the value of the commodity, the cost to the Government in the parallel program for price supports,[19] 7 U.S.C.A. § 1441 et seq., but proceeding on the premise set forth in the declaration of National policy, 7 U.S.C.A. § 1341, a serious mistake in estimating these factors would, or might, thwart the whole objective of the Act and precipitate chaos, not assure stability. Only slightly less important are the similar decisions fraught with much consequence to be made by the State Committee as they determine the apportionment of the county allotment fairly amongst the counties on a five-year average after adjustments for abnormal weather conditions, the extent, in percentage, of the State Reserve and to what extent and how it shall be used for the adjustments specified in the statutory categories, note 15, supra.

The incongruity of any such haphazard scheme is merely emphasized by the number[20] of such Review Committees and the unique provision of the Act which automatically makes allotments by Review Committee nonquota[21] acreage. Add to this the fact that under any such interpretation, the Government whose policy is being affected and

---

19. E. g., over five billion dollars were loaned by the Commodity Credit Corporation on cotton from 1933 to 1955. Statistical Abstract of the United States, 1956, p. 648.

20. In Texas there are 51 Review Committees. Assuming an absolute, honest, good faith, conscientious effort carefully to follow the law scrupulously, this would mean that, at least for all or a portion of the farmers within their respective jurisdictions, there could be 51 different determinations of the National acreage allotment, the allotment which ought to have been made to the State of Texas, the allotment which ought to have been made to the county, and the distribution of the State Reserve. If Texas could do this, so could the other 20 allocated cotton-producing states.

From the inexhaustible storehouse of useful and other bureaucratic information, Mitchell v. Hodges Contracting Co., 5 Cir., 238 F.2d 380, at page 383, the Secretary's brief tell us that there were ap-

proximately 6,000 review proceedings involving the 1954 crop and about 14,000 review proceedings involving the 1955 crop. On Fulford's theory, each of these was a permissible forum in which to review the whole cotton program.

21. 7 U.S.C.A. § 1368: "Notwithstanding any increase of any farm marketing quota for any farm as the result of review of the determination thereof under sections 1361–1368 of this title, the marketing quotas for other farms shall not be affected."

This means that, if jurisdictionally free to do so, each of the 51 Review Committees could conclude that the State Reserve, for example, should have been allocated for trends in acreage as it was in 1954 (80%) or 1955 (60%). At least to the extent of 191,000 acres, the Texas State allotment would thereby be increased. Likewise adjustments by the State Committee for abnormal weather conditions, 7 U.S.C.A. § 1344(b, e), are obviously debatable as inevitable opinion

whose tax-gathered money is being spent by the millions is completely at the mercy of the conscience and judgment of these part-time administrators comprising the Review Committees for it is the farmer alone who can appeal, note 7, supra.

We need not consider whether Congress might have delegated so much to so many free from traditional Governmental responsibility. We need only say what is too patent: Congress did not do so. Only by such a construction may we "* * * preserve the vitality of the Act and the utility of the language * * *," Sunshine Anthracite Coal Company v. Adkins, 310 U.S. 381, 392, 60 S.Ct. 907, 912, 84 L.Ed. 1263, 1270, and assure a result " * * * which effectuates rather than frustrates the major purpose of the legislative draftsmen," Shapiro v. United States, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787, 1806.

■ Since the statute itself does not accord to the Review Committee power to consider things beyond those matters relating to the use and distribution of the County Allotment as established by the State Committee, the regulation, Section 711.30(b), 12 F.R. 1388, implements this approach and is obviously valid.[22]

This does not mean that the cotton farmers are necessarily without the means of judicial review for those acts by the State Committee, the Secretary, or his other agencies, deemed to be not in accordance with law. What those rights are, or where, or how they may be asserted is not before us.[23] We merely hold that the route through Sections 1363, 1365, 1366 is not the one.

Affirmed.

and if determined to have been erroneous, the added acreage would be added to the State quota. Repeated for equally cogent local reasons in each of the 21 States, the Secretary's determination of the National Marketing Quota would, or might soon, become a mere beginning figure.

22. In reaching this, we do not adopt the Secretary's contention that by the Reorganization Plan No. 2 and his re-delegation of duties to the prior agencies, note 3, supra, the Secretary in effect could, and did, impose his own non-statutory limitations on the authority of his "reappointed" agents. Congress merely meant, we think, that each should be directly responsible to the Secretary for efficient-line accountability, but with no power in the Secretary to disturb the statutory authority, whatever that was, of each of these specified committees.

23. Illustrating possible avenues for review but without our holding that any such remedy is or is not open, or the conditions under which it might be available or used, and reserving all such questions for unfettered future decision, is action under the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. Since the Sections 1363–1366 remedy is not available, this may satisfy the prerequisites of that Act, 5 U.S.C.A. § 1009(b, c). As acreage allotments are indispensable to cot-

ton farming, it may be that these actions by successive levels of administrators qualify as Sanctions or Licenses under 5 U.S. C.A. § 1001(e, f), and, unless the Agricultural Adjustment Act of 1938 indicates a purpose to preclude all judicial review or commit all to the unreviewable discretion of the Administrator, 5 U.S.C.A. § 1009, which must be clearly demonstrated, Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868; Brownell v. Tom We Shung, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225; see, for summary of legislative history of APA, footnote 13, Amarillo-Borger Express v. United States, D.C.Tex., 138 F.Supp. 411, at page 418, judgment vacated, dismissed as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598; Dixie Carriers, Inc., v. United States, D.C.Tex., 143 F.Supp. 844, 851, appeal pending, probable jurisdiction noted, 353 U.S. 906, 77 S.Ct. 662, 1 L.Ed.2d 661; cf. Heikkila v. Barber, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972; Marcello v. Bonds, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107, a court having jurisdiction over the person of the administrative agents making the particular decisions which are basic to an asserted complaint may, by some suitable proceeding, have the right to determine whether the action of such officers has been in accordance with law.