Fred CHANDLER, Sr., et al., Appellants,

v.

W. Lewis DAVID et al., Appellees.

No. 21117.

United States Court of Appeals
Fifth Circuit.

July 28, 1965.

Leon Jaworski, Houston, Tex., amicus curiae, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

Maurice R. Bullock, Fort Stockton, Tex., Ashley Sellers, Washington, D. C., Thomas R. Scott, Fort Stockton, Tex., John D. Conner, Washington, D. C., for appellants.

Edward Berlin, Atty., Dept. of Justice, Washington, D. C., Fred J. Morton, Asst.

U. S. Atty., El Paso, Tex., Alan S. Rosenthal, Pauline B. Heller, Attys., John W. Douglas, Asst. Atty. Gen., Ernest Morgan, U. S. Atty., Dept. of Justice, Washington, D. C., for appellees.

Before GEWIN and BELL, Circuit Judges, and McRAE, District Judge.

GEWIN, Circuit Judge:

This appeal raises difficult questions of administrative authority in the context of the Agricultural Adjustment Act's intricate statutory scheme for regulating the production of certain agricultural commodities. 7 U.S.C.A. §§ 1281–1393.[1] More specifically, it relates to the propriety of the administrative cancellation of certain cotton allotments that had previously been transferred from an Oklahoma eminent domain pool to land in Texas pursuant to section 378 of the Act, 7 U.S.C.A. § 1378.

As a general principle, the Act does not sanction the sale or transfer of commodity allotments apart from the land to which they are attached.[2] In 1958, Congress enacted section 378 to permit the transfer of agricultural commodity allotments which had been lost as a result of eminent domain proceedings to condemn the land for which they had originally been authorized. Pursuant to this section, when farm land is condemned under the power of eminent domain, the allotment is placed in a pool "and shall be available only for use in providing allotments for other farms owned by the owner so displaced." The following procedure is prescribed for a farmer who desires to obtain a transfer to other farm land:

> "Upon application to the county committee, within three years after the date of such displacement, or three years after the enactment of this section, whichever period is longer, any owner so displaced shall be entitled to have established for *other farms owned by him* allotments which are comparable with allotments determined for other farms in the same area * * *." (emphasis added)

On February 14, 1961, the Administrator of the Commodity Stabilization Service, pursuant to the general authority granted the Secretary to issue rules necessary to implement the Act,[3] promulgated Amendment 11 to 7 C.F.R. § 719.12. That regulation conditions the right of a displaced farmer to transfer an allotment on a showing that the acquisition of the new farm to which the allotment is sought to be transferred is "for the purpose of reestablishing farming operations" and is not a scheme for the purpose of obtaining the allotment for the benefit of some other person.[4] The

1. We do not propose to outline in this opinion the regulatory scheme for the control of agricultural production embodied in the Act. The reader who is interested is referred to earlier opinions in this field. See Allen v. David, 5 Cir. 1964, 334 F.2d 592; Fulford v. Forman, 5 Cir., 1957, 245 F.2d 145; Morrow v. Clayton, 10 Cir., 1963, 326 F.2d 36.

2. There are exceptions in addition to the one under consideration here. E.g., 7 U.S.C.A. § 1344(n), relating to loss of allotments as a result of natural disasters.

3. 7 U.S.C.A. § 1375(b) provides: "The Secretary shall prescribe such regulations as are necessary for the enforcement of this subchapter."

4. The regulation, 7 C.F.R. § 719.12(d)(2), states in part:
   "(2) Transfer of allotment from the pool. Upon written application by the displaced owner by August 29, 1961 or within three years after such owner is displaced, whichever is later, to the county committee of the county in which the farm which is to receive allotment from the pool is located, the county committee shall determine whether the transaction by which the displaced owner claims to have acquired the farm to which it is requested that the allotment be transferred and the requested transfer is for the purpose of reestablishing the farming operations of the displaced owner or is a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the dis-

Administrator's stated purpose in promulgating the amendment was "to make the procedures for the transfer of allotment [sic] from the pool under 7 U.S. C. 1378 more effective in preventing the sale of allotments from the pool or the transfer of allotments from the pool for the benefit of some person other than the displaced owner."

The Chandlers are cotton farmers who in 1960 owned certain large tracts of land in Culberson County, Texas, for which they had no cotton acreage allotments. Desirous of planting cotton on this land, the Chandlers went to Custer County, Oklahoma, where they arranged, through the services of certain employees of the County ASCS Committee, to meet local farmers who had cotton allotments in the eminent domain pool. As a result of their negotiations, the Chandlers gave to each of fifteen displaced farmers warranty deeds to enough of the land they owned in Culberson County, Texas, to support each farmer's available cotton allotments. The farmer in turn assumed an indebtedness of $35 per acre which the Chandlers owed to their grantors and agreed to pay the Chandlers clearing costs of $20 per acre. The land so transferred was then leased back to the Chandlers for a twenty-year term at a rental of $100 to $125 per acre.

The Oklahoma farmers, pursuant to section 378, applied to the Culberson County ASCS Committee for approval of the transfer of their allotments to the land which the Chandlers had deeded to them. They appeared before the committee on February 17 and April 22, 1961, either in person or by affidavit, and executed the required forms, including requested information as to the nature of the transactions by which they acquired the land to which transfer of the allotments was sought. Copies of the deeds and leases were made available for County Committee's inspection. The farmers also executed Form CSS-178, which contained the following certification: "I have made no side agreement with any person for the purpose of obtaining an allotment from the pool for a person other than myself." All of the transfers were approved by both the County and State Committees, and the requisite allotment notices for 1961 were sent to the displaced farmers as owners

placed owner. *The application for transfer shall contain a certification by the applicant that he has made no side agreement with any person for the purpose of obtaining an allotment from the allotment pool for a person other than himself.* Before an application is acted upon by the county committee the applicant shall personally appear before the county committee after reasonable notice and bring with him all pertinent documents for examination by the committee and answer all pertinent questions bearing on the proposed transfer, unless the State committee determines from facts presented to it on behalf of the applicant that the applicant would be unduly inconvenienced by such an appearance on account of illness or other good cause and an appearance by the applicant before the county committee would serve no useful purpose. *If an allotment is transferred hereunder and it is later determined by the county committee that the transfer was obtained by misrepresentation by or on behalf of the applicant the allotment for the farm shall be reduced by the amount of the transfer for each year the transfer purportedly was in effect* and if the time for withdrawal from the pool has not expired the amount of the reduction shall be returned to the pool. The action of the county committee in approving or disapproving an application or in reducing the allotment for misrepresentation shall be effective only upon approval of the State committee or its representative and the issuance of an appropriate allotment notice under the applicable commodity regulations. If the county committee determines that the transaction by which the displaced owner acquired the farm to which the allotment is to be transferred and the proposed transfer is for the bona fide purpose of reestablishing the farming operations of the displaced owner and is not a scheme or device to sell the allotment or to transfer the allotment for the benefit of some person other than the displaced owner the county committee shall determine the allotment or increase of allotment to be transferred from the pool to such farm. * * *" (emphasis added)

and the Chandlers as operators. A crop of cotton was planted, harvested, and marketed by the Chandlers on the lands during both 1961 and 1962.

In the summer of 1961, the Department of Agriculture commenced an investigation of all allotments transferred from eminent domain pools. The Department found indications of irregularities in the transactions surrounding the transfer of the Oklahoma farmers' allotments and suggested that all the details of the transaction may not have been fully disclosed to the County Committee at the time the applications for transfer were made. Therefore, the Department of Agriculture requested the Chandlers to furnish information about the transfers on prescribed government forms entitled "Seller's Certificate of Bona Fide Sale of Land," as a prerequisite to a determination of the 1962 acreage allotment for the Culberson County lands. In this form the Chandlers certified that the displaced owners had made the initial payment for the farm to which the pooled acreage allotments had been transferred.

On April 26, 1962, after the Department had completed its investigation, a representative of the State ASCS office met with members of the County Committee and discussed the Chandler transfers. The Committee subsequently entered the following notation in its minutes with respect to the acreage involved in those transfers:

"At the direction of the Administrator ASCS, revised farm allotment notices are being furnished the following farm operators and owners for the reason that investigation has disclosed irregularities in certification that no side agreements exist relating to the sale and lease back of the land involved. It has been concluded that failure to furnish all documents and side agreements (oral or written) was a misrepresentation of the facts when coupled with the applicants' certification on Form CSS-178 that there were no side agreements for the purpose of obtaining an allotment for a person other than the applicant:"

On the following day, the County Committee issued formal notices retroactively cancelling the allotments in question. Overproduction penalties were later assessed for cotton marketed from the tracts in 1961 and 1962.

Pursuant to the provisions of 7 U.S. C.A. § 1363, timely appeals were perfected to a Review Committee composed of three local farmers appointed by the Secretary. Meanwhile, the Chandlers and the displaced farmers instituted a civil action in the district court against the Culberson County Committee, the State ASCS Director, and the State ASCS Committee, in which they sought to restrain the refusal to issue allotments for 1962 and to enjoin the collection of penalties for 1961 and 1962. This suit also challenged the jurisdiction of the Review Committee to hear the appeal, alleging that review was available only under section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009. Before the merits of this suit could be considered, the Review Committee, one member dissenting, affirmed the cancellation of the transfers after a three-day hearing at which the Chandlers and two of the displaced Oklahoma farmers testified. The Chandlers and the displaced farmers then instituted this suit in the district court pursuant to 7 U.S.C.A. §§ 1365-1366 to obtain a review of the Review Committee's decision. The two federal court proceedings were consolidated, and in a lengthy opinion the district court held that the Review Committee had jurisdiction to hear the appeal, that Amendment 11 was a valid exercise of regulatory power by the Department of Agriculture, and that the findings of fact by the Review Committee were supported by substantial evidence. Accordingly, it affirmed the action of the Review Committee in all respects. Kephart v. Wilson (W.D.Tex. 1963) 219 F.Supp. 801.

The appellants make a frontal attack on the Department's authority to promulgate the standards set forth in

Amendment 11 as guidelines for the County Committee's determination whether a farm is owned by the displaced farmer. They argue that section 378 gives the farmer whose land is condemned a right to have the allotment he loses transferred to any other land he owns, regardless of the purpose behind the transfer or the use to which the farmer intends to put the land. To be entitled to a transfer, all the farmer must show is that he (1) previously owned land for which an allotment had been issued; (2) had been displaced from that land by governmental action; (3) applied for an allotment transfer within three years of such displacement; and (4) owns the land to which the transfer is sought. According to the appellants, the regulation places impermissible limitations on this right of transfer by introducing the additional contingencies that the farmer must intend to re-establish farming operations on the land and that his purpose must not be to obtain an allotment for the benefit of another person. Appellants urge that the controlling statutory standard must be ownership alone and that in the instant case it was established beyond question that the displaced farmers obtained legal title to the land to which the allotments were transferred.

■ Section 1375 represents a broad grant of supplementary legislative authority to the Secretary and his delegates, and regulations implementing the Act will not be struck down unless "plainly and clearly inconsistent with the law." Fowler v. Gage (10 Cir.1962) 301 F.2d 775, 778; see Rigby v. Rasmussen (10 Cir.1962) 275 F.2d 861. We think Amendment 11, far from being inconsistent with section 378, is manifestly in line with its language and purpose. In the amendment the Secretary has merely attempted to define the meaning of a "farm owned" by the applicant for transfer as that phrase is used in the Act. The legislative history is clear that section 378 was drafted to alleviate the hardship to a farmer who loses his allotment through exercise of the power

of eminent domain. Thus, the exception carved out in section 378 is a benefit only to the displaced farmer; it was not intended to be used as an instrument for obtaining allotments for other persons. Congress, in excepting allotments lost through condemnation from the general ban against transfer, did not intend to afford the farmer the privilege of selling the allotment itself. We think that by Amendment 11 the Department has merely made this congressional purpose explicit by defining the standard for transfer in terms of bona fide farm ownership for the purpose of re-establishing farming operations. Morrow v. Clayton (10 Cir.1963) 326 F.2d 36.

■ Of course, as the Government concedes, this standard does not prevent a displaced farmer from leasing farm land to which a pooled acreage allotment has been transferred. This is a legitimate use of the land and the allotment. Whether such a transaction is permissible depends on an assessment of the bona fides of each particular case. As is often the situation, no clear-cut rule can be articulated. It follows that the County Committee, the Review Committee, and the district court applied the proper standard in assessing the transfers in question.

However, by upholding the substantive criteria of Amendment 11 we have vaulted only the first hurdle. The appellants challenge the authority of the Department to effect a retroactive cancellation of the allotments in question in the absence of an express congressional grant of such power. They rely largely on CAB v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961); United States v. Seatrain Lines, Inc., 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947); and Pan American Petroleum Corp. v. Pierson (10 Cir.1961) 284 F.2d 649, cert. denied, 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 848, in support of this contention. It is urged that the grant of an allotment gives the farmer something in the nature of a vested right and that, under the rationale of these cases, the agency cannot redetermine the

right to transfer in the absence of express authorization from Congress. We do not agree.

■■ It must be borne in mind that Amendment 11 permits a reconsideration of the approval of a transfer only in the relatively limited situation in which the transfer has been obtained by a misrepresentation as to the nature of the transaction by which the farmer acquired his new land. Its obvious purpose is to prevent a fraud on the Act which would frustrate its objective of benefiting the nation's farmers through control of production. We think the part of Amendment 11 permitting retroactive cancellation of allotments for misrepresentation is a valid exercise of administrative authority to "prescribe * * * regulations * * * necessary for the enforcement of this subchapter." 7 U.S.C.A. § 1375(b); see Morrow v. Clayton, supra at 45, of 326 F.2d. It was certainly reasonable for the Secretary to conclude that a re-examination of such transfers was necessary to prevent a fraud on the Act and to safeguard its effective enforcement.[5]

■■ The appellants objection to the cancellation extends as well, however, to the imposition of overproduction penalties, see 7 U.S.C.A. § 1346, as to the acreage of cotton planted on the land during the years the transfers were purportedly in effect. Amendment 11, if it constitutes a valid exercise of regulatory power, provides expressly that upon a determination that a transfer was obtained by a misrepresentation by or on behalf of the applicant, the amount of the allotment shall be reduced by the amount of the transfer for each year for which the transfer had been approved. This action would result automatically in the imposition of penalties pursuant to § 346. We also regard this portion of Amendment 11 as a valid regulation. The purpose of the penalty provisions of the Act are "to deter farmers from planting and marketing more than their quotas." Rodgers v. United States, 332 U.S. 371, 374, 68 S.Ct. 5, 7, 92 L.Ed. 3, 7 (1947). It is consistent with this basic purpose to utilize the penalty provisions as a means of discouraging schemes to sell allotments and thus pervert the objectives of the Act. We think the threat of overproduction penalties may serve as a deterrent here just as they do in discouraging overplanting. Hasty v. Carter, 105 Ga.App. 139, 123 S.E.2d 563 (1961), on which the appellants rely, is inapposite, for there no regulation authorized retroactive cancellation of al-

---

5. We do not have in the instant case an attempt to apply a new agency policy retroactively as in Seatrain Lines or a failure to adhere strictly to statutory procedures for the modification of agency action in granting a license as in Delta Air Lines. Amendment 11 was in effect at the time all of the transfers in question were made by the Culberson County Committee, albeit it had only been published one day prior to the first group of appearances before the County Committee on February 17, 1961. The parties are presumed to know the provisions of the applicable regulations. Furthermore, the record indicates that the Department had advised its local functionaries to apply the standard of bona fide ownership prior to the promulgation of the amendment. That the displaced owners were apprised of these requirements is evidenced by the following excerpt from a letter sent to the farmers by the County Office Manager of the Hudspeth-Culberson County ASCS prior to their appearances:

"We would like to make it clear to persons wishing to transfer acreage [sic] from the pool that the proposed purchase *is a bona fide purchase.* Discovery of side agreements will subject the person to criminal liability for false statements and cause the cancellation of any transferred pooled allotments to the farm together with its related history acreage." (emphasis added)

In addition, the allotment notices each contained the following admonition:

"1. REVISION OF ALLOTMENT. This allotment is subject to such changes as may be necessary under the procedure for determination of allotments for the designated crop year, taking into account (1) any incorrect data or information used in establishing this allotment or (2) any change in the total land in the farm for such year from that shown on the reverse."

lotments in the circumstances presented. We do not deem that case controlling.

Having upheld the validity of Amendment 11, we turn to the appellants' challenge to its application. It is urged that the Review Committee had no jurisdiction to adjudicate the validity of the transfers, since in the circumstances the only route of review is by way of an action in the district court under the Administrative Procedure Act, 5 U.S.C.A. § 1009. Under the latter section the district court rather than the Review Committee would be required to make the determination that the appellants had misrepresented their qualifications for a transfer of allotments.

█ Pursuant to the statutory scheme created by the Act, once the acreage allotments are apportioned among the counties of the state, the County Committee is given authority to distribute the acreage allotments to individual farms. 7 U.S.C.A. § 1344(f). Section 378 also gives to the County Committee primary authority to approve a transfer of allotments from an eminent domain pool. Amendment 11 supplements this power of the County Committee by providing that it may cancel transferred allotments which it finds were obtained by misrepresentation. Section 363 provides that "[a]ny farmer who is dissatisfied with his farm marketing quota may * * * have such quota reviewed by a local review committee composed of three farmers from the same or nearby counties appointed by the Secretary." 7 U.S.C.A. § 1363. A farmer may obtain court review of an adverse decision of the review committee pursuant to 7 U.S.C.A. § 1365, and the court's determination is "limited to questions of law." The Review Committee's findings of fact are binding on the court "if supported by evidence." 7 U.S.C.A. § 1366. This remedy is exclusive in cases in which it is applicable. See, e. g., Allen v. David, (5 Cir.1964)

334 F.2d 592; Weir v. United States (8 Cir.1962) 310 F.2d 149.

In the instant case, the appellants assert that this exclusive review mechanism is inapplicable because the County Committee, although required to make the initial determination whether a transfer was obtained by misrepresentation, did not in substance take any independent action to cancel the Chandlers' allotments. The minutes reveal, it is argued, that the County Committee merely served as a rubber stamp for the improper action of the State ASCS Administrator in cancelling the allotments and that it only issued the cancellation and penalty notices at his direction. They rely on Morrow v. Clayton (10 Cir. 1963) 326 F.2d 36 and Fulford v. Forman (5 Cir.1957) 245 F.2d 145 for the proposition that the Review Committee has jurisdiction to review only the bona fide actions of the County Committee; it has no power to supervise the actions of the State Committee or the State AS CS Administrator.

█ We cannot take such a rigid approach to the review provisions of sections 363–366. Section 363 provides for an appeal to the Review Committee from adverse action with respect to an individual farmer's marketing quota. In further delineation of the Review Committee's jurisdiction, 7 C.F.R. § 711.30(b) provides in part: "In all cases the review committee shall consider only such matters as, under the applicable provisions of the act and the regulations of the Secretary of Agriculture thereunder, are required or permitted to be considered by the county committee in the establishment of the quota sought to be reviewed." In the instant case, although it is perhaps arguable that the State Administrator improperly influenced the action taken by the Culberson County Committee,[6] that body in fact took formal

6. It may be that the State Administrator, as an ex officio member of the State Committee, 16 U.S.C.A. § 590h(b), did not exceed his authority in directing the cancellation of the Chandler transfers. Under the administrative structure the State

Committee has general supervisory power over the actions of the various county committees. 7 C.F.R. § 7.20. Amendment 11 provides that "the action of the county committee * * * in reducing the allotment for misrepresentation shall

action to cancel the appellants' allotments and assess penalties. Furthermore, authority to take this action was vested in the County Committee by the valid provisions of Amendment 11. The questions presented here are not comparable in scope and impact to those in Fulford v. Forman, supra, in which action of the state ASCS officials relating to the statewide policy of apportioning acreage allotments among various sections of the state was drawn into question. Instead, the present controversy relates to action which affects only the marketing quotas and acreage allotments of certain individual farmers. As such, it is a matter properly to be considered by the County Committee and reviewed by the Review Committee.

Indeed, we think our decision in the instant case is controlled directly by our earlier decision in Allen v. David, supra. There we were asked to review a county committee's cancellation of certain rice allotments prior to exhaustion of the administrative remedy provided by section 363. The action there was induced by the State Committee. We nevertheless held that the right of appeal to the Review Committee had to be exhausted prior to the institution of a proceeding to obtain court review of the agency's action, whether such action was induced, influenced, or instigated by state ASCS officials.

Morrow v. Clayton, supra, is distinguishable. There, the County Committee refused to take any action to cancel the allotments in question, and the State Administrator issued the revised allotment notices himself. In that case, there was no County Committee action which the Review Committee could consider. In addition, that opinion indicates that the cancellations involved may have been part of a statewide policy formulated by the state officials which the Tenth Circuit believed brought the case within the rationale of Fulford v. Forman, supra. No similar contention has been advanced here.

Assuming without deciding that the State Administrator unduly influenced the action of the County Committee and that the County Committee did not make an entirely independent determination that the Chandler transfers were obtained by misrepresentation as required by Amendment 11, the defect was cured by the *de novo* hearing before the Review Committee. As the district court correctly pointed out in its opinion, the facts surrounding the cancellation of the transfers were fully aired before the Review Committee, and, as a result, the Review Committee held a lengthy hearing in which it considered the question of misrepresentation *de novo*. We cannot see how any prejudice resulted to the appellants from this procedure. See Graham v. Lawrimore (4 Cir.1961) 287 F.2d 207. Accordingly, we hold the Review Committee, pursuant to 7 U.S.C.A. § 1363, and the district court, pursuant to 7 U.S.C.A. § 1365, properly exercised their jurisdiction to review the propriety of the cancellations in question.

The only remaining substantive issue is whether, applying the standards set forth in Amendment 11, the Review Committee could have concluded that the transfers were obtained through misrepresentation and that there was in effect at the time the applications for transfer were made a side agreement to obtain the allotments for the benefit of persons other than the displaced owners. The evidence introduced at the Review Committee hearing indicated that the transactions surrounding the transfers were less than genuine, particularly in light of the almost total indifference with which the displaced farmers viewed their purchases. For example, several deeds

be effective only upon approval of the State committee or its representative. * * * " Therefore, the failure of the County Committee to make a finding of misrepresentation may be subject to review and corrective action by the State Committee under its supervisory powers. If so, it can persuasively be argued that the State Committee was merely exercising this authority in directing the cancellations in the instant case. We do not answer this question, of course.

had to be corrected for misdescriptions and material errors, the farmers never saw the land they were purchasing until after the deeds and leases had been executed, they did not select the tracts they purchased, the farmers had no agreement with the prior lien holders to release the liens upon payment of that portion of the Chandlers' indebtedness to their grantors which the farmers assumed, there was no reservation of outstanding mineral rights in favor of the State of Texas, and the Chandlers, as *sellers,* paid earnest money to some of the displaced owners prior to their visit to Texas. The displaced farmers executed no note or other evidence of obligation to pay the purchase price, and initially they had no agreement in writing as to when the purchase price would be paid. Also, the Chandlers initiated the negotiations through employees of the Custer County ASCS office who were paid for their services by the allotment acre transferred,[7] and the Chandlers handled all the paper work in connection with the sales and leases. The rent under the twenty-year leases was paid in full in the first two years. In addition, in 1962 the Chandlers represented to the County Committee in a "Seller's Certificate of Bona Fide Sale of Land" that the farmers had fully satisfied the first purchase installments without any financial aid from the Chandlers, although the latter had, in fact, made the payments to the lienors on behalf of four Oklahoma farmers without any corresponding deduction from the rental payment the Chandlers made to those farmers. From all of these circumstantial factors, the Review Committee concluded that an understanding that the Oklahoma farmers were not

obligated to pay the purchase price for the tracts was in effect at the time of the applications and that the existence of this agreement was not revealed to the County Committee.[8] In addition, many of the factors evidencing the existence of this agreement were not revealed to the Committee. From all the above circumstances, the Review Committee concluded that the transactions were not for the purpose of the applicants' reestablishing farming operations, but were schemes to obtain allotments for the benefit of persons other than the displaced farmers. Admittedly, the Review Committee's determination was in direct conflict with the testimony of the displaced farmers and the Chandlers that no such agreement existed. Nevertheless, we think the inference that a side agreement existed was permissible in these circumstances. Rarely can a misrepresentation be proved by overwhelming direct evidence, and it is necessary to resort to circumstances to prevent schemes which might destroy the effectiveness of the national agricultural program.

We therefore hold (1) that Amendment 11 as far as it applies to this case is a valid exercise of delegated authority; (2) the Review Committee had jurisdiction to review the cancellations in question; and (3) the Review Committee's finding that the transfers were obtained by misrepresentation as to the existence of a side agreement for the purpose of obtaining allotments for the benefit of persons other than the displaced owners is supported by substantial evidence. Accordingly, the judgment of the district court is affirmed.

7. Two employees were paid at the rate of $10.00 per acre for each allotment acre, or a total of $3530.00. After the investigation was commenced by the Department of Agriculture, these funds were returned to the Chandlers by the employees.

8. This conclusion is bolstered by the following from the findings of the Review Committee:

"On April 25, 1962, Hubert Kephart and Fred Chandler, Sr., appeared before the Texas State ASC Committee and Kephart was asked the following question by Mr. Pool, a member of the State Committee: 'Well, then, the deed that you got was it a clear title to it, do you have a clear title to it now—you wouldn't have to pay a dime if you didn't want to?' To which Kephart answered: 'Actually I would not. As far as I'm concerned I won't have to pay anybody a nickel for it because I do have a clear deed to it.'"