Orville FREEMAN, Secretary of Agriculture of the United States of America, Appellant,

v.

Darius N. BROWN et al., Appellees.

No. 21588.

United States Court of Appeals
Fifth Circuit.

Feb. 26, 1965.

**206**

Alan S. Rosenthal, Martin Jacobs, Atty., Dept. of Justice, Washington, D. C., Neil Brooks, Asst. General Counsel, Howard Rooney, Atty., Dept. of Agriculture, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Donald H. Fraser, U. S. Atty., of counsel, for appellant.

Homer S. Durden, Jr., Swainsboro, Ga., Thomas B. Bird, Jr., Henry C. Hamilton, Monticello, Fla., Jack A. Hornett, Asst. Atty. Gen., Tallahassee, Fla., for appellees.

Before BROWN and BELL, Circuit Judges, and SPEARS, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This is an appeal by the Secretary of Agriculture from an order of the District Court permanently enjoining him from enforcing a cut in acreage allotments on Type 14 flue-cured tobacco for the 1964–65 tobacco marketing year below allotments for the 1963–64 marketing year. Plaintiffs, appellees here, are tobacco farmers and producers of Type 14 flue-cured tobacco. The basis of their class action against the Secretary was that he had failed and refused to treat Type 14 as a separate kind of tobacco in arriving at the marketing quotas on which the acreage allotments were based, but had grouped it with all other types of flue-cured tobacco. The complaint consisted of two counts; the first in the nature of a petition for mandamus, and the other for declaratory judgment. The District Court followed generally the prayers of the count for declaratory judgment in granting the injunction. The prayer of the mandamus count was for an order compelling the Secretary to discharge his statutory and regulatory duties with regard to setting marketing quotas and acreage allotments on the type of tobacco in question. It was claimed that he failed to use the latest available statistics in making the determination in issue.

The Secretary moved to dismiss the complaint, or in the alternative for summary judgment. Appellees also moved for summary judgment. Each motion for summary judgment was supported by affidavits, and appellees offered the testimony of a Marketing Inspector for the Georgia Department of Agriculture. The motions of the Secretary to dismiss and for summary judgment were overruled. The motion of appellees was granted and

the injunction which forms the subject matter of this appeal was entered.

## THE ISSUES PRESENTED

There are three issues for consideration. First, it is urged that the District Court did not have jurisdiction over the subject matter of the action. Second, the Secretary says, even assuming jurisdiction, he would be entitled to judgment as a matter of law because the Agriculture Adjustment Act does not permit the Secretary to constitute a type of tobacco as a separate kind of tobacco for a single year of the three year period for which marketing quotas and acreage allotments based thereon have been set. The relief sought was for the last year of such a three year period. Lastly, assuming both jurisdiction and requisite authority, it is contended that the determination by the Secretary not to treat Type 14 flue-cured tobacco as a separate kind of tobacco for the year in question was regularly made and supported by substantial evidence.

## STATUTORY BACKGROUND

The duty of the Secretary to set marketing quotas, and from these to set tobacco acreage allotments arises under the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1282 et seq. This Act, 7 U.S.C.A. § 1301(b) (15) provides as follows:

"'Tobacco' means each one of the kinds of tobacco listed below comprising the types specified as classified in Service and Regulatory Announcement Numbered 118 of the Bureau of Agricultural Economics of the Department:

"Flue-cured tobacco, comprising types 11, 12, 13, and 14;

\* \* \* \* \* \*

"The provisions of this subchapter shall apply to each of such kinds of tobacco severally: *Provided,* That any one or more of the types comprising any such kind of tobacco shall be treated as a 'kind of tobacco' for the purposes of this chapter \* \* \* if the Secretary finds there is a difference in supply and demand conditions as among such types of tobacco which results in a difference in the adjustments needed in the marketing thereof in order to maintain supplies in line with demand: \* \* \*."

It also provides, 7 U.S.C.A. § 1301(c), that:

"The latest available statistics of the Federal Government shall be used by the Secretary in making the determination required to be made by the Secretary under this chapter."

The determinations to be made are set out in 7 U.S.C.A. § 1312(a) (1) (2):

"(a) The Secretary shall, not later than December 1 of any marketing year with respect to flue-cured tobacco, \* \* \* proclaim a national marketing quota for any kind of tobacco for each of the next three succeeding marketing years whenever he determines with respect to such kind of tobacco—

"(1) that a national marketing quota has not previously been proclaimed and the total supply as of the beginning of such marketing year exceeds the reserve supply level therefor;

"(2) that such marketing year is the last year of three consecutive years for which marketing quotas previously proclaimed will be in effect; \* \* \*."

The Secretary is directed to issue what is called a National Marketing Quota for a three year period. Within thirty days after the Secretary has issued that quota he is required to conduct a referendum of the affected farmers to determine whether they favor such quota for the three year period. 7 U.S.C.A. § 1312(c). After the setting of the quota i. e., the three year quota, and prior to the referendum, the Secretary must announce the part of the three year marketing quota to be in effect for the next year. 7 U.S.C.A. § 1312(b). The quotas for each of the next two years are set at the end, respectively, of the first and second marketing year. And apparently the three year

quota is an estimate, the whole of which may or may not be allowed by the Secretary over the course of the three years, depending upon supply and demand.

The Tobacco Stocks and Standards Act of 1929, as amended, 7 U.S.C.A. § 501, authorizes and directs the Secretary to collect and publish statistics relating to the quantities of leaf tobacco in all forms and types owned by or in the possession of persons other than the original growers of tobacco. The statistics are to be summarized quarterly with an annual report to be issued. This Act also makes it mandatory upon the Secretary to establish standards for the classification of leaf tobacco by types. 7 U.S.C.A. § 502. These standards were established in 1929 in Service and Regulatory Announcement No. 118, 7 C.F.R. 30.1, et seq. This announcement provides in pertinent part as follows:

§ 30.5 —"Class—One of the major divisions of leaf tobacco based on the distinct characteristics of the tobacco caused by differences in varieties, soil, and climatic conditions, and the methods of cultivation, harvesting, and curing."

§ 30.6 —"Type—A subdivision of a class of leaf tobacco, having certain common characteristics which permit of its being divided into a number of related grades. Any tobacco that has the same characteristics and corresponding qualities, colors, and lengths, shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco."

* * *

§ 30.31—"Classification of leaf tobacco. For the purposes of this classification, leaf tobacco shall be divided into the following classes:

Class 1. Flue-cured types. * * * For the purposes of this classification the classes shall be divided into the following types and groups set forth in § 30.36–30.44."

* * *

§ 30.36—"Class 1; flue-cured types and groups—(a) Type 11. That type of flue-cured tobacco commonly known as Old Belt Flue-Cured, Western District Bright, Middle Belt Flue-Cured, or Semiold Belt Flue-Cured; and produced principally in the Piedmont Sections of Virginia and North Carolina."

"(b) Type 12.—That type of flue-cured tobacco commonly known as Eastern Flue-Cured, New Belt of North Carolina Flue-Cured, Eastern District Bright, or Eastern Carolina Bright; and produced principally in the Coastal Plains Section of North Carolina, north of the South River."

"(c) Type 13.—That type of flue-cured tobacco commonly known as Southeastern Flue-Cured, Southeastern Bright, South Carolina Flue-Cured, or New Belt of South Carolina and Southeastern North Carolina; and produced principally in the Coastal Plains Section of South Carolina and the Southeastern Counties of North Carolina south of the South River."

"(d) Type 14.—That type of flue-cured tobacco commonly known as Southern Flue-Cured, Southern Bright, Southern District Bright, New Belt of Geor-

gia and Florida, Florida Bright, Alabama Bright, or Georgia Flue-Cured; and produced principally in the Southern Sections of Georgia and to some extent in Florida, Alabama, and Mississippi."

This classification by types was adopted in the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1301(15), supra. The Tobacco Inspection Act, as amended, 7 U.S.C.A. § 511 et seq., (1935), in § 511b authorized the Secretary to establish standards for tobacco by which its type, grade, size, condition or other characteristics might be determined and these standards were to be the official standards of the United States. The Secretary, pursuant to this authority, issued regulations having to do with inspection certificates which were to include, together with other information, the type, and grade of tobacco, and it was mandatory that such inspection certificate be placed on each lot of tobacco inspected at the time of sale in an auction warehouse. 7 C.F.R. 29.66(b), 29.71. Tobacco auction markets were also to be established under this Act. 7 C.F.R. 29.73. No tobacco can be sold in the United States except at such designated markets, and unless the tobacco has been sampled and inspected by an official inspector of the Secretary to determine and certify the type, grade, size, form, condition or other tobacco characteristics of the lot of tobacco. 7 C.F.R. 20.109.

The position of the appellees is that the Secretary failed to keep proper statistics and to use the latest available statistics to determine the supply of flue-cured tobacco on hand by types, and whether Type 14 should be treated as a separate kind of flue-cured tobacco before he set the marketing quota for the marketing year 1964–65. The fact is that the Secretary treated all types of flue-cured tobacco as one kind in arriving at the three year quota, and declined to treat Type 14 separately for 1964–65. The three year quota then in effect had been apportioned among the flue-cured tobacco production areas as follows:

| STATE | ACREAGE ALLOTMENT |
| --- | --- |
| Alabama | 500.00 |
| Florida | 13,586.02 |
| Georgia | 64,912.49 |
| North Carolina | 421,092.74 |
| South Carolina | 74,128.45 |
| Virginia | 64,041.95 |
| Reserve | 1,599.54 |

It was these acreages which were reduced by ten percent for 1964–65.

### THE EVIDENCE

In support of his motion for summary judgment, the Secretary filed several affidavits including his own. He stated that he was requested, on March 7, 1964, to establish Type 14 as a separate kind of flue-cured tobacco under the Agricultural Adjustment Act of 1938.[1] He was told at the time by counsel for appellees that his failure to so establish Type 14 would render the ten percent cut in acreage allotments for 1964, theretofore made by the Undersecretary as Acting Secretary, unlawful as applied to growers of Type 14 tobacco. The Secretary stated that he investigated the facts and determined that Type 14 tobacco should not be constituted as a separate kind of flue-cured tobacco, and that the determination of the National Marketing Quota for the marketing year beginning July 1964 on which the cut in acreage allotments had been made was in conformity with law. The Secretary gave three reasons for his conclusion. He stated that the Act did not contemplate establishing a new kind of tobacco during the three year period of a National Marketing Quota on which

---

[1]. The kinds of tobacco as now classified are set out in 7 U.S.C.A. § 1301(b) (15). The kinds listed are flue-cured, fire-cured, dark air-cured, Virginia sun-cured, burley, Maryland, cigar-filler, cigar-binder, and cigar-filler Type 41. Appellees seek to divide the flue-cured kind by having flue-cured Type 14 classified as an additional kind.

quotas had been approved by referendum for the kind of tobacco sought to be changed. He stated that there was not such a difference in supply and demand conditions as among the types of flue-cured tobacco as would result in a difference in the adjustments needed in the marketings thereof in order to maintain supplies in line with demand. See Title 7, § 1301(b) (15), supra. He gave as his reason for so finding that flue-cured tobacco is used almost entirely in the manufacture of cigarettes, that there is a high degree of homogenity among the several types and interchangeability in their use; that there has been a close price relationship among the types over the years, and that Types 11, 12, and 13 are readily marketable in the Type 14 production area and such tobacco when so marketed is classified as Type 14. His view was that Type 14 has the same characteristics including quality, colors and lengths as Types 11, 12, and 13, and that factors of historical or geographical nature could not be determined by an examination of the tobacco. His affidavit then contained the following statement which is of much importance in this case:

"That I did not have available statistics upon which to determine a quota for Type 14 as a separate kind of tobacco in conformity with the Act because the Department's statistics with respect to the production of Flue-cured tobacco by types are based on the area in which the tobacco is grown while the statistics with respect to the types of Flue-cured tobacco on hand are based principally on the location of the warehouse at which the tobacco was marketed, and the Department of Commerce which collects the records of the exports of Flue-cured tobacco does not report exports of Flue-cured tobacco by type."

The Undersecretary stated in his affidavit that at the time he set the annual quota under the three year National Marketing Quota, he was advised that some tobacco growers in Georgia and Florida were protesting any reduction in acreage allotment for flue-cured tobacco in those states on the ground that a smaller proportion of tobacco from those states had been going under government loan as compared to tobacco from other states producing flue-cured tobacco. He stated that because of this he gave consideration to whether Type 14 should be constituted as a separate kind of flue-cured tobacco. He determined that he could not take such action unless he found that there was a difference in supply and demand conditions as among the various types of flue-cured tobacco which resulted in a difference in the adjustments needed in the marketings thereof in order to maintain supplies in line with demand. This reasoning was based on § 1301(b) (15), supra. He then stated that he could find no statutory provision for making adjustments between types because of the amount of tobacco moving under loan. He also found that one type of flue-cured tobacco is readily substituted for another, and that large quantities of tobacco produced in an area associated with one type is marketed at warehouses located in areas associated with other types, and there classified as being the type corresponding to the type produced in the areas in which the warehouse is located. He also found that the reports of exports compiled by the Department of Commerce do not break exports of flue-cured tobacco into types.

The affidavit of a tobacco economist in the United States Department of Agriculture was submitted. He was of the view that flue-cured tobacco, regardless of where produced or type, is a substantially homogeneous commodity. He did not believe that flue-cured tobacco could be fragmented into types and hence all statistical data in the Department of Agriculture went to the whole rather than the separate types. He stated the data was lacking with respect to inventories representing tobacco grown only in the areas designated as producing Type 14, or as to any of the other separate types, or as to exports of the various types of flue-cured tobacco.

The Director, Tobacco Policy Staff, Agricultural Stabilization and Conservation Service, United States Department of Agriculture, stated that the records showing the estimated production of flue-cured tobacco compiled and issued by the Statistical Reporting Service of the Department show production estimates of flue-cure tobacco by types and by states, but that these estimates were based on areas of production without regard to the areas in which the tobacco is marketed. He stated that the Tobacco Stocks Reports are based on the areas in which the tobacco is marketed without regard to the areas in which the tobacco was produced, and that all tobacco marketed in the Georgia tobacco markets was classified as Type 14 without regard to the area in which it was produced. Stocks reports by types and marketings by types were not compatible with flue-cured tobacco production estimates by types since substantial quantities are produced in one state or area and marketed in another.

The Director of the Tobacco Division of the Agricultural Marketing Service of the Department of Agriculture stated that he administered regulations issued pursuant to the Tobacco Statistics and Standards Act, supra, and the Tobacco Inspection Act, supra. He explained that records as to types are based on the place of marketing rather than the place of production, and contended that this was recognized from the beginning of the classification system due to the similarity of the various types of flue-cured tobacco. He pointed to a contemporary explanation of the proviso in Announcement No. 118, supra, 7 C.F.R., § 30.6, defining the types:

" * * * Any tobacco that has the same characteristrics and corresponding qualities, colors and lengths, shall be treated as one type, regardless of any factors of historical or geographical nature, which cannot be determined by an examination of the tobacco."

The contemporaneous explanation alluded to give flue-cured tobacco as an example, and pointed out that the Type 11 area would produce tobacco of very nearly the same character as that produced in the Type 12 area, and that Type 11 could be sold as Type 12 without being detected. It was said that the department did not wish to require the segregation of such tobacco unless the difference could be clearly determined by an examination of the tobacco itself.

Appellees, in support of their motion for summary judgment, submitted several affidavits including those of two tobacco growers. One stated that flue-cured tobacco grown in North Carolina and Virginia is distinguishable from flue-cured tobacco grown in Georgia in color, texture and leaf size. He stated that he had observed baskets of North Carolina and Virginia tobacco being sold at warehouses in Georgia. His statement was based on experience gained in growing flue-cured tobacco for 46 years, and from observing auction sales of tobacco in Georgia, North Carolina and Virginia. The other affiant stated that from a visual examination he could see a difference in the color, body, length and size of tobacco leaves as between tobacco grown in Georgia and tobacco grown in the other flue-cured tobacco belts. He attributed this to difference in soil and climate conditions, and to the fact that tobacco in Georgia is more generally irrigated which gives it a more uniform appearance than is true of nonirrigated tobacco grown in the other belts.

The testimony of a Marketing Inspector for the Georgia Department of Agriculture was offered by appellees. He presented charts, based on data obtained from the United States Department of Agriculture, which demonstrated that in the seventeen year period from 1946 through 1963, a total of 163,000,000 pounds of Type 14 tobacco was placed under government loan while in the year 1963 alone 129.1 million pounds of Type 11-A tobacco was placed under loan.[2] Another chart demonstrated that as of January 1, 1957, 104.3 million pounds of

2. Apparently Type 11 has been, since Announcement No. 118, supra, divided into Types 11-A and 11-B. This does not appear of record.

Type 11–A tobacco was held in the Stabilization Corporation and 271.9 million pounds as of January 1, 1964. On January 1, 1957, 33.2 million pounds of Type 14 was on hand but by January 1, 1964 this total had decreased to 16.8 million pounds. Another chart showed that in 1963 only 2.8 percent of tobacco marketed as Type 14 was placed in government loan, and it was conceded that some of this was not Type 14. His testimony was that more than 13 million pounds of other types of flue-cured tobacco had been brought into Georgia and was sold as Type 14 in 1963. As to the remaining types, 12.2 percent of Type 13 was placed under government loan in 1963, 14.2 percent of Type 12, 21.7 percent of Type 11–B and 43.6 percent of Type 11–A.

## JURISDICTION

Appellees invoked the jurisdiction of the court below under the judicial review provision of the Administrative Procedure Act. 5 U.S.C.A. § 1009. The Secretary contends that judicial review, and thus jurisdiction, is precluded under the provision of that section which excepts agency action from judicial review where a statute precludes judicial review, or where agency action is by law committed to agency discretion. § 1009(a).

■ It is settled that a statute must clearly demonstrate the intention of Congress to preclude judicial review in order for review to be denied by this exception. Cf. Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868; and Fulford v. Forman, 5 Cir., 1957, 245 F. 2d 145, footnote 23. The Secretary points to 7 U.S.C.A. §§ 1363–67, the review provisions of the Agricultural Adjustment Act, and says that the review there provided is exclusive. These sections permit review by a local review committee in the event a farmer is dissatisfied with his farm marketing quota, and the determination by that committee may be judicially reviewed. United States v. Sykes, 5 Cir., 1962, 310 F.2d 417, 420. But it is clear that this review provision does not permit review of the apportionment of a state allotment among counties. Fulford v. Forman, supra.

■ The Secretary contends that the intention of Congress was to preclude a challenge to the manner in which a national crop quota was fixed, or the manner in which a national quota was allocated or apportioned to states and counties. We conclude that there is no basis in the Agricultural Adjustment Act for attributing such an intention to Congress where, if such be the case and that is the allegation, the Secretary has failed to comply with statutory mandates relating to the gathering and using of statistics, the consideration of which is a condition precedent to determining whether types of tobacco should be treated as separate kinds in establishing marketing quotas.

It is urged that even assuming *arguendo* this to be the case, judicial review under the Administrative Procedure Act is nevertheless unavailable to appellees because the action of the Secretary was by law committed to his discretion. It is said that the determination that supply and demand factors did not warrant treating Type 14 as a separate kind of tobacco constituted an exercise of discretion and nothing more. Such discretion is vested in the Secretary by the statute. 7 U.S.C.A. § 1301(b) (15). This discretion, however, was not unfettered but was subject to the requirement that the Secretary use the latest statistics in making the determination. § 1301(c), supra. And another statute required that these statistics be compiled. 7 U.S.C.A. § 501.

■ The crux of the complaint is that the Secretary failed to keep and consider the latest statistics in making the determination as to treating Type 14 as a separate kind of tobacco, and therefore departed from the statutory base on which his discretion was to be exercised. This was a sufficient jurisdictional allegation. In sum, we conclude that judicial review of the Secretary's determination not to treat Type 14 as a separate kind of tobacco is not precluded by statute, nor is the determination com-

mitted by law to the Secretary's unfettered discretion. Furthermore, the decision of the Secretary constituted final agency action for which there is no other adequate remedy in any court. See 5 U.S.C.A., § 1009(c). We therefore hold that the District Court had jurisdiction to review the action of the Secretary under the Administrative Procedure Act.[3]

## THE MERITS

As is indicated by the statement of the evidence adduced on the motions, the Secretary does not contend that he exercised his discretion as to whether to treat Type 14 as a separate kind of tobacco on full facts. The statistics available to him with respect to acreage planted in flue-cured tobacco were based on areas of production and hence types. The statistics reflecting stocks on hand or supplies were based on the location of the warehouse at which the tobacco was marketed. These statistics did not reflect types as all types were treated as that of the producing area in which the warehouse was located. This, of course, amounted to no statistics by types, and was in contravention of the duty to keep statistics by types, 7 U.S.C.A. § 501, supra, unless there was no practical difference in the types. He also stated that records of exports were not kept by types, but these were records kept by the Commerce Department and may or may not have been relevant. Neither the Secretary nor those of his staff whose affidavits on the subject were submitted in the District Court deem it necessary to keep statistics based on types. They seem to be of the opinion that the high degree of homogeneity among the types was such as to render it conclusive that all of the types should be treated as one for purposes of establishing marketing quotas. This conclusion is buttressed only by other conclusions such as high degree of interchangeability, similarity in prices, and

the like, but none of these underlying conclusions were supported by facts.

On the other hand, appellees submitted the affidavits of two witnesses who testified, based on experience and observation, that there is a difference in color, texture and size of Type 14 as distinguished from the other types. One of these affiants stated that this was due to the high degree of irrigation used in the Type 14 belt. The testimony of the Georgia Marketing Inspector was based on statistical information sent him by the United States Department of Agriculture. It showed that a much less proportion of the Type 14 crop was placed under the government loan program. Only 2.8 percent of Type 14 went under loan, while the other types varied from 12.2 percent of Type 13 up to 43.6 percent of Type 11–A for the year 1963. These figures also showed that over a period of 17 years ending in 1963 only 163,000,000 pounds of Type 14 tobacco was placed under loan while 129.10 million pounds of Type 11–A went under loan in 1963 alone. These facts strongly support an inference that a substantially greater proportion of Type 14 was selling above the support level than was true of the other types. Moreover, his testimony demonstrated that at least some statistics were available in the Department of Agriculture to separate true Type 14 tobacco from tobacco produced in other areas and sold at markets in the Type 14 area, inasmuch as he testified that "a fraction more than 13 million pounds" was brought into Georgia and sold as Type 14 in 1963. In short, he had statistics separating Type 14 from the other types both by sales and under the loan program.

This testimony is not conclusive on the question of whether the Secretary abused his discretion in not treating Type 14 as a separate kind of tobacco, but it does show that statistics were available

3. The legislative history of the Administrative Procedure Act as it pertains to the exceptions to review based on statutory preclusion of review, or matters committed to agency discretion is set out

in Amarillo-Borger Express v. United States, N.D.Tex., 1956, 138 F.Supp. 411, 418, footnote 13. This history fully supports the conclusion we have reached.

to the Secretary which were not considered by him in making the determination, and that there was a practical difference in characteristics as between Type 14 and some of the other types such as would warrant a consideration of comparative statistics.[4] All in all, and as a matter of proof since the hearing went beyond a motion for summary judgment to the point where both sides were satisfied with the proof and to submit the case for final judgment, the evidence was sufficient to show that the Secretary departed from what is required of him by statute: to keep statistics and consider the latest available statistics in making the determination as to kind when arriving at marketing quotas.

This made out a case for appellees to the extent of the Secretary having failed in this duty, and the difficult question presented to the District Court and to this court is what relief should have been accorded. It would have been improper for the District Court to have taken up the question of whether the Secretary abused his discretion in holding that Type 14 was not to be treated as a separate kind of tobacco as a matter of fact. The evidence adduced was insufficient to demonstrate this. In fact, the proof was not directed to this question. Facts as to prices, demand in the market by types, and the reason for differences in demand, if any, would, together with differences in characteristics, all be material, indeed a *sine qua non* to a judgment on an abuse of discretion question.

### RELIEF TO BE ACCORDED

■ We hold that the order of the court now under consideration cannot be

sustained in its entirety. It goes beyond what is warranted by the evidence and in fact amounts to the setting of a markeing quota by the court. This follows from the fact that the court, without conclusive evidence as to whether Type 14 should be treated as a separate kind of tobacco, in effect increased the acreage allotment by adding ten percent to the Type 14 acreage allotment. This relief was unwarranted in fact and in law. The proper approach would have been to deny the injunctive relief sought under the declaratory judgment count of the complaint, and to grant relief to the extent necessary and warranted under the first count of the complaint which was aimed toward requiring the Secretary to perform his statutory duties.

This means that the court in exercise of its equitable discretion once it found, as it did and as we affirm, that the Secretary had failed to use the latest statistics in treating with the contention that Type 14 should be a separate kind of tobacco, should have directed the Secretary to reconsider his decision in the light of what the statutes required of him.

This was indicated by the fact that the marketing quota and acreage allotments had been set two years before appellees registered their complaint as to the treatment being given to Type 14. All flue-cured tobacco farmers had approved the marketing quotas and all that was left for the Secretary was to establish the annual quota for each of the last two marketing years of the period. The Secretary was entitled to a reasonable time to consider the contentions of the appellees, but they are entitled to have him follow the statutes and otherwise

4. The objection of Type 14 producers to the sale of other types in their area has been the subject matter of previous litigation, Campbell v. Hussey, 1961, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299, affirming the district court's holding that a Georgia statute requiring different color tags to be placed on the different types was unconstitutional. In footnote 3 of the Supreme Court decision it was said:
"'Both the purpose and effect of the Georgia enactment were to make a distinction at the markets, by the color tags, between tobacco grown in Georgia and that grown elsewhere. The effect was to create a wide disparity of price between the two groups of tobacco, the Carolina growers receiving a much lower amount. This resulted in losses of business to the plaintiff warehousemen.' 189 F.Supp. 54, 59."

consider facts relevant to their contentions that Type 14 should be treated as a kind of tobacco separate from the other types of flue-cured tobacco.

This determination by the Secretary is apart from the question as to when he may change the marketing quotas and acreage allotments if he should conclude to treat Type 14 as a separate kind. That is another question and one not ripe for decision at this time. Whether such separate treatment may be commenced prior to the setting of any annual marketing quota, simply by reapportioning the acreage among the several states or otherwise, or whether it may only be done prior to the setting of the three year marketing quota is a question that first should be considered by the Secretary, and will only arise in the event he determines to treat Type 14 as a separate kind of tobacco. We add that, contrary to the contention of the Secretary, when such acreage relief, if any, as appellees may be entitled to will be accorded them in no way bars their right to a proper and present consideration of their claim.

It is thus apparent from what we have said that the judgment must be reversed because of its breadth, but in reversing we hold that the District Court should enter an order directing the Secretary to reconsider within a reasonable time the question of treating Type 14 as a separate kind of flue-cured tobacco in the light of all available and material facts, including such statistics as he may have or which may be reasonably derived from presently available facts or statistics, to the end of making a considered and fair judgment, in the exercise of his discretion, as to the question presented. Whether there is a high degree of homogeneity on the types, or interchangeability in their use are questions of fact. Evidence should be available as to whether there are material differences in the characteristics of the types, and in demand and prices. In any event, the Secretary shall make his decision on statistics which are presently available or which may be compiled from other statistics, documents, and other evidence presently available. This evidence may be obtained from the Department or elsewhere, such as from records that may be maintained by purchasers of tobacco from producers. The Secretary must make a decision and his decision, if reviewed after he follows the statutory mandates, will be on the basis of whether he has abused his discretion in the decision.

The determination of the Secretary may be made on the basis that any change in marketing quotas and acreage allotments based on his decision, if it should be to treat Type 14 as a separate kind of tobacco, shall be prospective in application. As stated, we do not reach the question of whether such relief may be applied prospectively to the next annual quota or whether it must await the first year of a three year marketing quota.

Reversed and remanded for further proceedings not inconsistent herewith.