David M. RAKESTRAW and Walter D. Rakestraw, Plaintiffs,

v.

H. P. WINCHESTER, A. D. Warren and Goerge Sockwell, Review Committee, Agriculture Stabilization Conservation Service, Defendants.

No. C–132–G–65.

United States District Court
M. D. North Carolina,
Greensboro Division.

May 16, 1966.

Norwood E. Robinson, of Bethea, Robinson & Moore, Reidsville, N. C., for plaintiffs.

William H. Murdock, U. S. Atty., and H. Marshall Simpson, Asst. U. S. Atty., Greensboro, N. C., for defendants.

## MEMORANDUM OPINION

EUGENE A. GORDON, District Judge.

Under the provisions of 7 U.S.C.A. § 1365 and § 1366, the plaintiffs instituted this action to obtain judicial review of the decision of the Agricultural Stabilization and Conservation Service (hereinafter referred to as "ASCS") Review Committee for Rockingham County (hereinafter referred to as the "Review Committee"). The Review Committee is established under the provisions of 7 U.S.C.A. § 1363. The plaintiffs seek a reversal of the decision of the Review Committee regarding the 1965 flue-cured tobacco marketing quota for their farm.

The facts are not in dispute. In November, 1964, the plaintiffs acquired an option on a 285 acre tobacco farm in Simpsonville Township, Rockingham County, North Carolina, which farm is identified as farm No. J757, the purchase price of the farm being $75,000.00.

At the time of the acquisition of the option, the farm had a tobacco acreage of something in excess of eleven acres.

A new referendum on the proposed reduction of tobacco acreage was imminent and the plaintiffs awaited resolution of this question before taking action on the option. In due course, the tobacco farmers approved the reduction of tobacco acreage by 19.5 per cent, thus leaving the plaintiffs' farm in question with a tobacco allotment of 10.69 acres. The value of the farm with its adjusted acreage and before the tobacco poundage allocation, as amply supported by testimony by members of the community before the Review Committee, was $75,000.00. Thereupon, the plaintiffs in mid-December, 1964, exercised their option. The plaintiffs were of the opinion that the farm would produce 2,500 to 3,000 pounds of tobacco per acre.

Subsequent to their purchase of the farm, proposed legislation was introduced in the Congress which was ultimately to become the present poundage marketing control program. At this point plaintiffs, after studying the proposed legislation, saw disaster looming on their economic horizon. This danger was occasioned by the combination of the anticipated operation of the proposed legislation and the peculiar history of tobacco production appertaining to their newly acquired farm.

When the proposed legislation, ultimately to become P.L. 89–12, was reported to the House of Representatives by its Committee on Agriculture, the Committee noted, with some prescience, considering the present litigation, that:

" * * * it was certain that the writing of a simple and equitable bill would be difficult * * * the bill in its present form is far from simple." House Rep. No. 147 (Committee on Agriculture) 89th Cong. 1st Sess, U.S.Code Congressional and Administrative News, p. 1506.

Simplicity was never achieved on the balance of its legislative journey. The method by which the marketing quota for a farm producing flue-cured tobacco is determined is set out in Simpson v. Laprade et al., 248 F.Supp. 399, 400–401 (W.D.Va.1965):

"The first step is the determination of a 'preliminary farm yield' which approximates the average yield per acre for the farm for a five year period. The number of pounds of flue-cured tobacco produced each year for the period of 1959 through 1963 is divided by the total acreage of tobacco harvested from the farm for each year respectively. Having obtained the yield per acre for each of these five years, the three highest years are selected and a simple average of these three years is taken. The 'farm yield' is next ascertained by multiplying the preliminary farm yield by the national yield factor of .9349. Then the farm marketing quota is simply the farm yield times the acreage allotment."

The "national yield factor" referred to supra, is itself somewhat complex. It is sufficient to state that it is intended to be a modifying factor applied to the "farm yield" which will bring tobacco production within limits of usability both domestic and foreign plus the establishment and maintenance of the desired reserve. 7 U.S.C.A. § 1314c(a). The bill was indeed what its opponents termed "supply management with a vengeance." 111 Cong.Rec. 5653 (March 23, 1965) (Remarks of Rep. Anderson of Ill.)

It becomes readily apparent that the production controls of the legislation providing for the marketing quota for any given farm (except as modified by certain other factors not here important) were firmly tied to the farm's historical production of tobacco. The undisputed evidence considered twice by the Review Committee was that the prior owner of the plaintiffs' farm was unable to exercise personal supervision of the farming operations thereon and that his manager was an unskillful agriculturist who, considering the quality of the land and making due allowance for the usual vagaries of weather and other uncertainties did not achieve the tobacco production from his acres which he should reasonably have been expected to have obtained for the past half-decade. The plaintiffs thus determined that under the proposed leg-

islation, because of the prior, improper cultivation of the land, the historical production of the farm would, of necessity, prohibit their marketing the anticipated 2,500 to 3,000 pounds of tobacco per acre. There was undisputed testimony by tobacco farmers in the plaintiffs' community in the rehearing before the Review Committee to the effect that the production controls diminished the value of the plaintiffs' farm by some $20,000.00.

The plaintiffs did not sit and nurse their grievances but telephoned and subsequently had correspondence with the Honorable B. Everett Jordan, United States Senator from North Carolina. They indicated the position in which the legislation, if passed, would place them. At the time, the Senate Committee on Agriculture & Forestry had before it S. 821, the Senate version of what was ultimately to become P.L. 89–12.

Senator Jordan referred a letter received from Mr. David Rakestraw to the Department of Agriculture for a review of the data therein contained and requested the suggestions of the Department as to how S. 821 could be amended to more adequately meet the needs of producers of tobacco. This letter of Senator Jordan to the Department of Agriculture is not contained in the record but is referred to in other correspondence.

In reply to Senator Jordan, Mr. H. D. Godfrey, Administrator of the Department of Agriculture's Agricultural Stabilization and Conservation Service, wrote the Senator on March 15, 1965, stating:

> "We have long recognized that any formula that might be used in establishing individual farm yields for the 198,000 farms which have flue-cured tobacco allotments could not be equally satisfactory to all farms. We are convinced, however, that farm yields must reflect each farm's historical production, *but that some adjustments will be necessary in order to establish farm yields that will be fair and equitable.*
>
> *"The reserve authorized in Subsection (e) of S. 821 for correcting errors and establishing allotments for 'new' farms could be expanded to authorize its use for adjusting inequities."*
>
> \* \* \* \* \* \*
>
> *"We believe the changes suggested above will give some relief to the problems raised by Mr. Rakestraw."* (Ex. 1, on Rehearing before Review Board.)

(Emphasis supplied.)

The "reserve" referred to in the Administrator's letter is that provided in 7 U.S.C.A. 1314c(e) which provides that the Secretary of Agriculture may set aside such from the national acreage allotment for certain designated purposes.

On March 23, 1965, H.R. 5721 (the House version of the proposed legislation) was passed by the House of Representatives. 111 Cong.Rec. 5502 (Daily Ed. March 23, 1965)

On April 1, 1965, prior to the consideration of the proposed legislation by the Senate, Senator Jordan wrote plaintiff David Rakestraw stating:

> "We took up this matter in the Senate Committee on Agriculture and Forestry this morning, and we approved the bill essentially as the House of Representatives had passed it. *It is my intention to make it abundantly clear in the legislative history of the bill that the national reserve set aside is to be used by the Secretary of Agriculture to alleviate hardship problems such as yours."* (Ex. 2 on Rehearing before the Review Committee.)

(Emphasis supplied.)

On April 5, 1965, the Senate considered H.R. 5721. During the course of extensive debate thereon, Senator Jordan referred to the existence of the reserve:

> "I should also like to add at this particular point that a situation has been called to my attention by one or two farmers and there are probably several others—who this year bought new farms they had never farmed before.

However, the farms had tobacco allotments on them. Sometimes the farmer who had owned the farm was not a very good farmer, or for some reason or other, did not fertilize properly or do a great many of the things that should have been done to insure an average yield that would be in line with the yield of his neighbors for the same quality of land.

*"I envision that this 1 percent could be used in terms of raising the allotment already made for the acreage, or perhaps a little extra acreage may be granted so that the production of the land would be in accordance with the average yield. I hope the 1 percent will be used to work out the problem. There would be an inequity in the case of a farmer who had acquired a piece of land which he had not farmed himself but which land did have an allotment on it."* 111 Cong. Rec. 6760, 6761 (Daily Ed. April 5, 1965) (Remarks of Sen. Jordan.)

The Bill was subsequently passed. It was signed by the President on April 16, 1965. P.L. 89–12: "Legislative History."

The plaintiffs were notified on April 30, 1965, by the Rockingham County A.S.C.S. that they had a total poundage of 15,180 pounds for their 10.69 acres of tobacco allotment for 1965. Plaintiffs thereupon requested a hearing which was granted by the ASCS County Committee for Rockingham County (hereinafter referred to as the "County Committee"). This committee approved the poundage allocation made for the farm and advised the plaintiffs orally that the Secretary of Agriculture had never established the 1 per cent reserve from which the plaintiffs claimed they were entitled to relief and that there was no additional poundage which could be awarded them under any law.

Plaintiffs then requested a hearing by the Review Committee under the provisions of 7 U.S.C.A. § 1363 and a hearing was accordingly granted and conducted June 25, 1965, at the Rockingham County A.S.C.S. Office. The Review Committee found that the marketing quota had been properly determined.

On July 6, 1965, the plaintiffs filed a petition in the Superior Court of Rockingham County under the provisions of 7 U.S.C.A. § 1365 seeking judicial review of the decision of the Review Committee and requesting:

"* * * that the court issue an order directing the Rockingham County ASC (sic) Committee to grant a new hearing to the petitioners on their appeal * * * that the ASC (sic) County Committee be directed to consider any evidence which would constitute an inequity and make such provisions for adjusting the inequities as may * * * be shown by any evidence presented by the petitioners. * * * *"

On July 23, 1965, the United States Attorney for the Middle District of North Carolina filed a petition for removal of the action to the United States District Court under the provisions of 28 U.S.C.A. § 1441 et seq., and the action was so ordered removed on July 28, 1965.

On October 19, 1965, the cause, on motion, was remanded to the Review Committee for consideration of additional evidence and on November 12, 1965, the Review Committee after hearing and reconsideration of the plaintiffs' application for modification of their tobacco marketing quota affirmed its determination of June 25, 1965. On November 18, 1965, the plaintiffs filed their exceptions to the reaffirmed findings.

■ This Court's power to review the action of the Committee below is limited by statute.

"The review by the court shall be limited to questions of law, and the findings of fact by the review committee, if supported ˏby evidence, shall be conclusive." 7 U.S.C.A. 1366.

"Evidence" as employed in the statute above cited has been interpreted to mean "substantial evidence." Crolley et al. v. Tatton, 5 Cir., 249 F.2d 908, 911 (1957), cert. den. 356 U.S. 966, 78 S.Ct. 1005, 2 L.Ed.2d 1073 (1958); Kephart et al.

v. Wilson et al., 219 F.Supp. 801, 811 (W.D.Tex.1963), affirmed sub nom Chandler et al. v. David et al., 5 Cir., 350 F.2d 669 (1965), cert. den. 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966).

"The Review Committee is the trier of fact. Its findings, if supported by substantial evidence, are conclusive. * * * 'substantial evidence' * * * under the Act does not mean proof beyond a reasonable doubt but only such relevant evidence as a reasonable mind might accept to support a conclusion, * * * And '* * * it is not the Court's function to substitute its judgment for that of the Review Committee where the Committee has applied the broad phrases' in the regulations 'to a specific state of facts,' and there is substantial evidence to support its conclusions." (citations omitted) Review Committee, Venue VII, Etc. v. Willey, 8 Cir., 275 F.2d 264, 273 (1960) cert. den. 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522 (1960).

▮▮▮ It is the contention of the defendants that the Review Committee is without jurisdiction to pass on the claims of the plaintiffs, i. e., that their marketing quota should not only reflect the farm's historical production but its production potential as well; that the question of whether the Secretary of Agriculture should have made a poundage reserve available for the adjustment of inequities in farm yields could not be considered by the County Committee and the Review Committee, and it follows that the scope of judicial review of the determination of the Review Committee is equally circumscribed.

Under 7 U.S.C.A. § 1363, any farmer dissatisfied with his marketing quota may have the same reviewed by the Review Committee. The statute is barren of any recital of the Review Committee's jurisdiction or the extent of its power.

Pursuant thereto, the Secretary of Agriculture has promulgated a regulation detailing certain of its powers and limitations as follows:

"A review committee shall have jurisdiction to hear timely filed applications respecting quotas established or denied. * * * *In all cases the review committee shall consider only such matters as under applicable provisions of the act and regulations of the Secretary, are required or permitted to be considered by the County Committee in the establishment of the quota sought to be reviewed.*" 7 C.F.R. § 711.12 (Emphasis supplied.)

The regulations thus circumscribing a Review Committee's jurisdiction has been held to be a valid exercise of the Secretary's power. Fulford v. Forman et al., 5 Cir., 245 F.2d 145, 153 (1957).

As the Review Committee has neither greater jurisdiction nor more extensive powers than the County Committee aside from its appellate and review powers, recourse must therefore be had to the statutes and regulations delineating the powers of the County Committees. The latter are established under 16 U.S.C.A. § 590h(b) which section of the Code, although it does not itself clarify the powers of the County Committee, it does empower the Secretary of Agriculture to promulgate regulations necessary for the exercise of their activities.

The Secretary of Agriculture has provided in 7 C.F.R. § 7.3 that the County Committee is to conduct its operations:

"* * * in accordance with applicable laws, regulations *and official instructions.* (Emphasis supplied.)

A somewhat more extensive clarification of the position of the County Committee is found in A.S.C.S. GUIDE No. 5 published by the Agriculture Stabilization and Conservation Service of the Department of Agriculture, October 8, 1963, and which provides under the section entitled "Responsibilities of County Committee:"

"1. C. Programs must be administered in accordance with the laws, regulations *and national and State policies, procedure and instructions.* The Committee must recognize that:

* * * * * *

"3. The laws, regulations *and procedures* are binding on the committee and necessarily limit its authority.

"4. *The committee and the county office are an instrumentality of the Department of Agriculture.*

\* \* \* \* \* \*

"6. *The committee, therefore, is necessarily subject to the instructions of the Secretary, and officials in the line of authority under him, namely the Administrator, the Deputy Administrator,* \* \* \* *the Area Director, the State Committee, the State Executive Director.* \* \* \* " (Emphasis supplied.)

It is then apparent that the County Committee and therefore necessarily the County Review Committee are almost entirely creatures of the Secretary of Agriculture and many of the lower officialdom between himself and the County Committee. Considering the decision in Fulford v. Forman et al., supra, there is nothing improper, under the terms of the present statutes in placing the committees here involved in so subservient and comparatively powerless position.

█ This is not to say that administrative due process has fled the scene. The committees possess varying ambits of power under the Agricultural programs for the different commodities and abuse of their discretion or a misuse of their powers is of course correctible by the courts as it was in Review Committee, Venue VII, etc., v. Willey, supra.

In the present case, it is the position of the A.S.C.S. Administrator that the law does not give to the Secretary of Agriculture the authority to establish a reserve poundage from the national marketing quota to be used to adjust farm yields; that the remaining acreage currently in the reserve has not been made available to the states for either adjusting inequities or making corrections in allotments; that the Secretary was without authority and did not establish a reserve to adjust inequities in farm yields under the acreage-poundage program; and that therefore the County Committee

had no reserve in either acreage or poundage from which to adjust inequities in the plaintiffs' case. Letter from the A.S.C.S. Administrator to Senator Jordan dated July 28, 1965 (Ex. 6 on re-hearing before Review Committee).

The Administrator's interpretation of the law is not without serious question, but it is undeniable that such is his interpretation and the committees involved are obligated to abide by it.

The North Carolina State A.S.C.S. office has likewise taken a position on this matter. NOTICE PA–90, "Handling Flue-Cured Tobacco Appeals," of the North Carolina A.S.C.S. State Office dated July 16, 1965, and addressed to "County Office" which purported to furnish instructions for handling corrections and appeals on yields for flue-cured tobacco for 1965, (and apparently this constitutes the sole written guidelines furnished for the edification of the County Committee on appeals under the 1965 tobacco legislation) provides that the said County Committee has only the responsibility for correction of mechanical errors and hearing appeals involving involuntary losses after harvest such as from fire. The principle of *expressio unius est exclusio alterius* would appear to preclude their consideration of appeals based on alleged "inequities" even if the Administrator had not taken his present position on the matter.

In addition, the Review Committee had also been informed by the State A.S.C.S. Committee when it received its instructions for conducting the hearing that no acreage or poundage was available for adjusting the plaintiffs' farm yield. Record of Initial Hearing before Review Committee, p. 4.

These officials, superior to the Rockingham County A.S.C.S. County Committee and Review Committee, made such determinations and the local committees are bound thereby.

In Freeman v. Brown et al., 5 Cir., 342 F.2d 205, 212 (1965), it was held that the review provided in 7 U.S.C.A. § 1363–1367 is a limited review and does not

permit review of the apportionment of a state tobacco allotment by the State A.S.C.S. Committee among the counties of the state and that a farmer could not use the provisions of this particular appellate procedure to compel the local Review Committee to act contrary to state policy or to require state officials to comply with statutory requirements.

In Fulford v. Forman et al., supra, the question of the jurisdiction of the Review Committee in regard to a controversy similar to the present case was extensively considered by the court and received careful analysis. The plaintiffs therein contended that the action of the State A.S.C.S. Committee was improper and not in accordance with the statute concerned with cotton allotments and that the Review Committee should rectify their errors in order to insure compliance with the law. The court held that such was beyond the authority of the Review Committee.

"At the outset, we must remember that involving, as it does, the national policy of dealing with the ever-present problem of farm surpluses, stability of farm income, and the use of Governmental sanctions or incentives in control of production and price, this is a matter of delicate complexity.

\*    \*    \*    \*    \*    \*

"If, as claimed, the language of Section 1363 \* \* \* is so broad that a county Review Committee can review the action of the State Committee \* \* \* so it can pass upon the actions of the Secretary himself, not only in allocating that State's acreage, but in the making of many other indispensable determinations." Ibid 245 F.2d at p. 149. (Emphasis supplied.)

The Court after carefully considering the legislative history and philosophy behind the Agricultural Adjustment Act could find no justification for the contention that the Review Committee possessed such broad powers. This Court adopts the view of this matter as expressed by the Court of Appeals of the Fifth Circuit, and therefore holds that the Review Committee did not in view of the stated position of the A.S.C.S. Administrator and the North Carolina State A.S.C.S. Committee, possess the jurisdiction to inquire into whether the Secretary of Agriculture, the Administrator of the A.S.C.S., or the North Carolina State A.S.C.S. Committee had complied with the applicable statutes and regulations or whether any of the aforesaid were correct or incorrect in their interpretation of such statutes and regulations.

If, therefore, the facts as found by the Review Committee are correct, and there is no dispute thereto, and further if said Review Committee correctly comprehended its jurisdiction and powers under the applicable statutes and regulations and applied such parts thereof as were within their competence and jurisdiction to apply, to the plaintiffs' case, and this Court finds that they did, then the decision of said Review Committee must be affirmed. It is accordingly so affirmed.

The plaintiffs herein are not without a possible remedy. As was indicated in Freeman v. Brown et al., supra, and Fulford v. Forman et al., supra, a mandamus proceeding to insure that the proper officials of the Department of Agriculture comply with their statutory duties could perhaps be instituted under the Administrative Procedure Act, § 10, 5 U.S.C.A., § 1009. Fulford v. Forman et al., supra, 245 F.2d at p. 153, n. 23, discuss possible avenues for review other than the one here taken by the plaintiffs. The foregoing is not to be construed as an expression of the Court's opinion on either the merits of the plaintiffs' contentions or on the probable success of such procedures, if undertaken.

An appropriate order will be entered.