**Dan W. DREW, Appellee,**

v.

**Rufus B. LAWRIMORE, T. B. Cunningham and J. B. Cook, as the Marketing Quota Review Committee, Area of Venue #5, State of South Carolina, of the United States Department of Agriculture, Orville L. Freeman, Secretary of Agriculture of the United States of America, Paul W. Kowalski, Charles E. Calhoun, Mills P. Tuten and C. B. Player, Jr., as the State Agricultural Stabilization and Conservation Committee for the State of South Carolina of the United States Department of Agriculture, and J. Evan Goodyear, Paul Richardson and W. F. Page, as the County Agricultural Stabilization and Conservation Committee for Marion County of the United States Department of Agriculture, Appellants.**

**No. 11117.**

United States Court of Appeals
Fourth Circuit.

Argued May 3, 1967.

Decided June 19, 1967.

Norman Knopf, Atty., Department of Justice (Barefoot Sanders, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Depart-ment of Justice, and Terrell L. Glenn, U. S. Atty., on brief), for appellants.

E. N. Zeigler, for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal from three orders of the district court which compel the Secretary of Agriculture and members of various Agricultural and Conservation Service (ASC) committees to establish new boundary lines for "local administrative areas" used in the administration of the tobacco marketing program.

This action was brought by Dan Drew, a Marion County, South Carolina, flue-cured tobacco grower, in an attempt to gain a higher tobacco quota for his farm. Since, by statute, the size of a tobacco quota depends in part upon the "local administrative area" or "community" in which a farm is situated,[1] Drew sought to have the boundary lines for Marion County communities redrawn so as to place his farm in a different administrative area and thus achieve a higher quota.

In its order of August 25, 1966, the district court held that the defendants were required by law to establish boundary lines for the Marion, South Mullins, and Rains Communities in Marion County as of December 1965, but that "no physical boundaries for [these] communities had been established * * *." The district court further held that in establishing these boundaries the defendants were to give consideration to natural resource factors affecting the use of the land.[2] The defendants were directed to

[1.] Until 1965 "local administrative areas" or "communities" had not been of great consequence to the average farmer since they did not affect a farm's marketing quota. However, the 1965 amendments to Section 317 of the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1314 (c), created a new tobacco program that for the first time utilized communities in a manner which directly affected the size of a farm's tobacco quota.

[2.] This conclusion was based on the district court's interpretation of Section 8 (b) of the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590h (b), which sets forth the basic administrative structure for agricultural programs and requires the Secretary to des-

44444444

4444444444444444

determine boundaries for the three communities as of December 1965, "giving full consideration" to conservation and economic policies in Section 8(b) of the Soil Conservation and Domestic Allotment Act,[3] and to "relevant physical, scientific and economic facts established * * * before the * * * [local] Review Committee, * * * as may have affected the use and conservation of [Drew's] land and other land similarly situated." [4] Defendants were ordered to file with the court a map showing the new boundary lines within ten days.

The defendants made the determination of boundaries between the communities in question and filed with the district court a map on which these were shown along with a lengthy explanation of their determinations. The defendants listed the various matters considered in constructing the boundaries. These included, in addition to pertinent statutes and regulations of the Department of Agriculture, the record before the local Review Committee and other relevant information with respect to weather and soils in Marion County.

The defendants explained that all maps relating to the establishment of communities in Marion County prior to 1966 had been lost or destroyed inadvertently under a five-year disposal program for old records. But in their judgment, considering the multiple relevant circumstances,

"in establishing community boundary lines as of December 1965 the lines of the then existing communities should be reestablished as nearly as possible from existing data * * *. It is found that by so doing the communities thus established meet reasonable requirements with respect to territory and workload and also give effect to natural resource boundaries such as the Little Pee Dee river * * *."

The defendants stated in their explanation that they took into consideration "insofar as is reasonably feasible" the provisions of Section 7(a) of the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590g(a).

The defendants, after analyzing various natural resource factors in Marion County, observed in their explanation that

ignate "local administrative areas." The district court reasoned that the broad policy considerations in Section 7(a) of the Act, 16 U.S.C.A. § 590g(a), must be read into every part of Section 8(b) of the Act. Thus, the district court concluded that the following policies, among others enumerated in Section 7(a) of the Act, should be considered in determining "local administrative areas": preservation and improvement of soil fertility; promotion of the economic use and conservation of land; and the diminution of exploitation and wasteful and unscientific use of soil resources.

3. 16 U.S.C.A. § 590g(a). See note 2 supra.

4. The local Review Committee, established pursuant to 7 U.S.C.A. Section 1363 for the purpose of reviewing marketing quotas of dissatisfied farmers, had conducted an administrative hearing in June 1966 on plaintiff Drew's quota. Drew produced Dr. H. P. Cooper, former Dean of the Clemson University School of Agriculture, who testified about various geological and weather factors operating in Marion County. On the basis of these

factors, Dr. Cooper drew a line purporting to represent a natural drainage divide and weather line in the county. He was of the opinion that farms east of the line were generally better suited for tobacco production than farms west of it.

Drew's farm is located east of this line while most of the Marion Community, in which Drew's farm was originally placed, was located west of the line. Thus, the Marion community "average yield", which is determinative of the maximum marketing quotas for the farms in the community, was based upon production of farms primarily located west of the line. Dr. Cooper concluded that it was "wasteful" and "unscientific" to determine Drew's production in connection with the lands west of the line. He believed the use of the land would be more "economic", in terms of income to the farm, if the farm were grouped with those east of the line.

Dr. Cooper acknowledged that his testimony was in good part mere theory, and that differing capabilities of farmers could result in a farm west of the line raising as much tobacco as one east of it.

"Yields of flue-cured tobacco within 9 separate areas [communities] in the county vary widely between individual farms in the area but in each area there are farms that compare with farms in other areas. Since soil types are not uniform on individual farms and the weather bureau records reflect adequate rainfall, it is not considered feasible to set up communities based on differences in soil or weather. * * * [V]ariations in yields are chiefly attributable to the cultural practices of the individual farmer such as the application of fertilizer and the spacing of plants together with the ability of the farmer to get the necessary work done on time and in a husbandlike manner."

The defendants conclude that though they are not in a position to pinpoint these individual practices, the community boundaries established by them "result in reasonable community yields both in amount and in relation to each other and require less than the average number of adjustments when compared with the State or country as a whole." [5]

The district court in an order of September 12, 1966, responding to a motion to confirm the new boundaries, rejected the boundaries established by the defendants. The district judge held that the "record and applicable law require that the line between Marion Community and/ or Rains and South Mullins Communities should follow as closely as practicable * * *" a specific line appearing in plaintiff Drew's exhibits which purported to represent the natural drainage divide and weather line in Marion County.[6] The district court then required the defendants under threat of contempt to redraw the boundaries in question within

four days in accord with the opinion expressed in its order. The defendants complied with the court's order, but filed timely notice of appeal. In an additional ruling on November 18, 1966, the district court declined to vacate its earlier orders.

Under the boundaries established by the defendants to meet the district court's order of August 25, 1966, plaintiff Drew's farm was located in Marion Community. The court-directed boundaries of September 12 placed Drew's farm in the South Mullins Community.

On this appeal the defendants do not take issue with the conclusion in the district court's order of August 25, that the boundary lines for the Marion County communities in question should be drawn anew. They ask us, however, to decide that the requirements of efficient administration, and not technical natural resource factors, are to determine the boundary lines for "local administrative areas" created by Congress to facilitate the administration of the agricultural program.

We need not decide this question. But in exercising restraint we in no way approve the position of the district court that natural resource factors are to be given controlling weight in determining the boundaries of "local administrative areas."

We believe it clear that the defendants gave consideration to natural resource factors in establishing community boundaries pursuant to the district court order of August 25, and, therefore, the district court erred in refusing to accept their determinations. The designation of "local administrative areas" is entrusted to the Secretary of

5. Defendants noted that as these Marion County communities were constituted, farms with similar histories of tobacco production were grouped together. Thus over 84% of the farms in the county had tobacco production that was within the 80-120% critical limits of the average tobacco production for the community in which that farm was located. Only 16% of the farms needed to have their tobacco production figures adjusted (only 9% downward) in Marion County as compared to 21% nationally.

The Marion Community in which Drew's farm was located is composed of high producing farms like his. The community average is higher than 69% of the flue-cured tobacco communities in the country.

6. See note 2 supra.

Agriculture, who has delegated this authority, as directed by statute, to state and county ASC committees.[7] The explanation which accompanied the determination of boundaries for the Marion, Rains, and South Mullins communities pursuant to the order of August 25, disclosed that full consideration was given by the State and Marion County ASC Committees to the natural resource policies and factors as directed by the district court. The defendants established boundaries which they believed fair to the farmers within the communities and reasonable in view of the overall operations and purposes of the farm programs.

The district court, notwithstanding compliance with the law as interpreted by it, refused to accept the reasonable administrative determination, and instead, substituted its own.

 We noted in Sleeth v. Dairy Prods. Co., 228 F.2d 165, at 167–168 (4th Cir. 1955), that the rule is well established that

"courts will not issue a mandamus or other order to control the action of an executive or administrative officer in the discharge of statutory duties involving the exercise of judgment or discretion, unless the attempted performance of the duty amounts to an abuse of discretion. * * *

"[An order] will lie to compel officers with discretionary duties to take action, but it will not interfere with the exercise of their discretion unless their action is illegal, or is an arbitrary or capricious abuse of such discretion."

Accord, e. g., Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 317–319, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 592–593, 69 S.Ct. 278, 93 L.Ed. 243 (1949); Work v. United States ex rel. Rives, 267 U.S. 175, 177, 45 S.Ct. 252, 69 L.Ed. 561 (1925). In Freeman v. Brown, 342 F.2d 205, 214–215 (5th Cir. 1955), the Secretary of Agriculture had not classified a certain variety of tobacco as a separate kind for the purpose of arriving at marketing quotas. The Fifth Circuit held that the district court correctly ordered reconsideration by the Secretary because he "departed from what is required of him by statute: to keep statistics and consider the latest available statistics in making the determination as to kind when arriving at marketing quotas." 342 F.2d at 214. However, the district court order was held to have gone "beyond what is warranted by the evidence and in fact amounts to the setting of a marketing quota by the court." Id. Instead "[t]he Secretary must make a decision and his decision, if reviewed after he follows the statutory mandates, will be on the basis of whether he has abused his discretion in the decision." Id. at 215.

There was no abuse of discretion by the defendants in the present case but a deliberate and well-reasoned determination. Accordingly, the district court orders appealed from of September 12 and November 18, 1966, are

Reversed.

---

7. Section 8(b) of the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590h(b), provides that "[t]he Secretary [of Agriculture] shall designate local administrative areas as units for administration of programs under this sec- tion." It also provides that "[i]n carrying out the provisions of this section * * * the Secretary is directed to utilize the services of local and State committees * * *."